THE UNITED STATES, APPELLANTS, *v.* JOSEPH DELESPINE, APPELLEE.

A grant by the Spanish authorities was made of ninety-two thousand one hundred and sixty acres of land at New river, in Florida, in 1813, afterwards the grantee determined to locate the grant on a river seventy miles south of New river. The grantee proposed erecting mills for sawing timber. No survey was made of land at New river, and the grantee claimed to have the grant confirmed, and to locate the same, by survey, at the place last selected. No mills were erected on the lands claimed, nor was any thing done by him under the grant, for the purpose of using or improving the land claimed to have been granted. Held, that the grant made in 1813, of land at the mouth of New river, imposed no obligation on the government of Spain, at the date of the Florida treaty, in 1819, to confirm the title claimed by the grantee; and that none rests on the government of United States, as the successor of the government of Spain, to the rights and obligations of Spain.

A concession of lands by the Council, at St. Augustine, was not authorized by the laws of Spain, relative to the granting and confirming land titles.

When a grant of land is indefinite as to its location, or so uncertain as to the place where the lands granted are intended to be surveyed, as to make it impossible to make a survey under the terms of the grant with certainty, the grant will not be confirmed.

The act of Congress of 26th May, 1830, requires, that all claims to lands which have been presented to the Commissioners, or to the Register and Receiver of East Florida, and had not been "finally acted upon," should be adjudicated and settled, as prescribed by the act of 1828. There was no direct limitation as to the time in which a claim should be presented.

When a petition for the confirmation of a claim to lands in Florida, was presented, and was defective, and the Court allowed an amended petition to be filed, it would be too strict to say the original petition was not the commencement of the proceeding, but that the amendment allowed by the Superior Court, should be taken as the date when the claim was first preferred.

When certain testimonials of title, under a Spanish grant, have been admitted without exception, before the Commissioners of the United States for the adjustment of claims to lands in Florida, and before the Superior Court in Middle Florida, without objection as to the mode and form of their proof; the Supreme Court, on an appeal, will not interfere with the question as to the sufficiency of the proof, or the authenticity of the acts relating to the title, which had been admitted by the authorities in Florida, which was the tribunal to judge of the evidence.

The case of The United States *v.* Clarke, 8 Peters, 454, cited.

APPEAL from the Superior Court, Southern District of Florida.

SUPREME COURT.

In November, 1830, Joseph Delespine presented a petition to the Superior Court of East Florida, asking for the confirmation of a grant by the Spanish government of Florida, of a tract of land on Rio Neuvo, of two leagues to each point of the compass; to contain ninety-two thousand one hundred and sixty acres.

The claim of the petitioner was founded on an alleged grant to Juan Xavier de Arrambide, a Spanish subject, by the Captain General of the Island of Cuba, on the 15th of November, 1813, and which was confirmed by the Governor, and Corporation of East Florida, the 22d of March, 1814.

The petition alleges, as the reason the claim was not before presented for confirmation, there was no person, during a great portion of the time, as the District Attorney of the United States, on whom process could be served as is required by the act of Congress.

The documents on which the claim was founded, and which were referred to in the proceedings, on the part of the petitioner, are particularly referred to, in the argument of the Attorney General of the United States, and in the opinion of the Court.

The United States resisted the claim, on the allegation, that if there had been a grant, which was not admitted, and without condition, the present claimant holding under the alleged grant to Juan Xavier de Arrambide, did not comply with the requisitions of the statute in such case made and provided; and also, that the claim is not protected by the Florida treaty.

The Superior Court of Florida made a decree in favour of the claimant; and the United States prosecuted this appeal.

The case was argued by Mr. Gilpin, Attorney General, for the United States; and by Mr. Downing, for the appellee.

Mr. Gilpin, for the United States.

This is a claim for the enormous amount of ninety-two thousand one hundred and sixty acres of land, which now are; and always have been unsettled and uncultivated. The claim has been allowed by the Superior Court of East Florida, and this Court is now called upon to ratify that decision. There are several grounds upon which this ought not to be done.

1. The claim is one of which the Court below had no legal cognisance at the time it passed upon it. Under the act of Con-

[The United States *v.* Delespine.]

gress, of 3d March, 1823, (3 Story's Laws, 1907,) commissioners were appointed to examine into the validity of these claims, and under its provisions this was presented to their consideration. Their report thereon was made in December, 1825, and submitted to Congress. On the 23d May, 1828, an act was passed, (4 Story's Laws, 2124,) authorizing claimants, whose claims had not been finally settled under the regulations previously adopted, to submit them for adjudication to the judge of the Superior Court of that district in Florida, in which the lands lay; but there was an express provision that they should be forever barred, unless this should be done within one year from the passage of the act, that is, before the 23d of May, 1829; or if, from any neglect of the claimant, they were not prosecuted to a final decision within two years, that is, the 23d of May, 1830. On the 26th of May, 1830, Congress, by an act then passed, (4 Story's Laws, 2198,) provided for certain claims that had been reported upon, among which the present was not embraced; they then went on to declare, in express terms, "that all the remaining claims, which had been presented according to law, and not finally acted upon," should be adjudicated by the Courts in Florida, in the manner prescribed by the act of 23d May, 1828. On the 20th of November, 1830, the present claim was presented to the Superior Court of East Florida. This the claimant had no right to do, unless it had been previously presented in the manner the law prescribed, and not finally acted upon. It may be doubted whether the submission of it to the commissioners, their decision, and its report to Congress, did not amount to such a final action as the law contemplated. Such cases cannot be considered as those which Congress regarded as unacted upon, and for which it was the object of the law to provide. It was evidently meant to grant time beyond the two years prescribed in the act of 1828, for the adjudication of the claims that might be then pending in the Courts of Florida. But, admitting that this case was not finally acted upon by the proceedings in 1825, still the main inquiry is, whether it had been previously presented "according to law." This was an indispensable requisite. The law required its presentation before the 23d of May, 1829. It was not so presented. Had it been so presented and not properly prosecuted, it would then have been within the terms of this act.

41

It never was the intention of Congress to permit those who had allowed their claims thus to remain unpresented, now to bring them, for the first time, before the Courts. The failure to "present the claim according to law," is fatal, therefore, to the present proceeding.

2. The title of the claimant is denied, under a grant to Juan Xavier de Arrambide, said to have been made by the council of the city of St. Augustine, on the 22d of March, 1814, in pursuance of a "certificacion," or testimonial in his favour, purporting to have been issued by the Provincial Deputation at Havana, and filed among the records of the City Council. The sole evidence of this grant, produced by the claimant, consists of a copy of the filed copy of the proceedings of the Deputation at Havana, and of the proceedings thereon of the City Council at St. Augustine. The whole of these are certified, at St. Augustine, by Juan de Entralgo, who merely says, "this a copy." There is also a certificate that Entralgo is secretary of the City Council, and a notary of the government. There is no secondary or corroborative testimony to sustain the grant. There is no evidence of the existence of the original documents either in Cuba or Florida. There is no survey, or subsequent order, or proceeding connected therewith. There is no proof of Entralgo's signature, or that of the annexed certificates. It is submitted, that this evidence is altogether insufficient to bring the case within the rule established by this Court, in the case of The United States v. Wiggins, 14 Peters, 348. If an alleged copy of a grant, thus unsupported by any additional testimony, is received as sufficient, it would not be difficult to sustain the most unfounded claims. The rule just referred to, is certainly one of the broadest liberality; it is all that claimants can require: to extend it, in the manner now proposed, would be seriously to endanger the evidences of titles, while it would give to claimants an indulgence which no just or prudent liberality requires.

3. But the grant, if made, was not legal and valid; it was not, and could not have been "perfected into a complete title, under and in conformity to the laws, usages, and customs" of the Spanish government. 3 Story's Laws, 1959. The grant consists of two distinct parts and proceedings. First, the "certificacion," or testimonial of the Provincial Deputation of Havana, dated 4th

December, 1813, in which they "are pleased to state" to the City Council of St. Augustine, "that they grant in property" to Arrambide, two leagues "of the land he may choose, from the mouth of New river, which discharges itself on the coast of East Florida, and through Puerto Largo, on the south part, following the same course to the shore." Secondly, the "accuerdo," or resolution of the "Ayuntamiento," or City Council of St. Augustine, dated 22d March, 1814; in which, "in obedience as well to the resolution of the aforesaid deputation, as to the approval of the most excellent Captain General, they determined to grant the favour solicited" by Arrambide, which was "to despatch to him the title of property of the said two leagues to the north of the river Miamis, which are on the north-west side of the Cayo Biscayno;" he reserving to himself to produce the plat of the said lands as soon as he found himself prepared to take it out; and they directed their Secretary to deliver to him an authenticated copy of all these proceedings. This purports to have been done on 3d June, 1814.

This grant thus depends, in fact, on the authority of the Provincial Deputation at Havana to make it. Whence is their power derived? No instance, among the numerous cases that have been adjudged by this Court, has occurred in which such an authority has been relied on by a claimant. It is at total variance with usage and practice; it is at total variance with the whole land system of the Spanish colonies; it has no sanction in the laws of the Indies. The answer given by counsel for the claimants to these objections is, that "the land was granted by the provincial committee, the constitution of that day being then in force in the provinces, and said committee having power to grant lands." To support this allegation, it must be shown that, by the constitution or laws of Spain, the Provincial Deputation at Havana had authority to grant lands in East Florida. What authority to this effect has been produced? Nothing, whatever, but the decree of the Cortes of the 4th of January, 1813. 1 Clarke's Land Laws, 1006. A slight examination of that decree, and of the constitutional provisions out of which it grew, will show, not only that it confers no such power, but that the exercise of it is at variance with the provisions and object of the decree. The new constitution of Spain was adopted by

the Cortes, in the absence of the king, on the 14th of March, 1812. The first and second chapters of the sixth title establish the " Ayuntamientos" or town councils, and the " Diputaciones Provinciales;" and prescribe the functions of both. Among these, no power is conferred to dispose of the public domain. It may have been the intention of the Cortes, and probably was, to vest in them this power, under regulations to be digested in future laws. By the constitution, however, it was neither directly or-indirectly done. 2 Decretos de las Cortes, 154. 157. Early in the following year we accordingly find the Cortes acting on the subject. On the 17th of January, 1813, the regency promulgated the decree adopted by the Cortes on the 4th of that month, (3 Decretos de las Cortes, 174. 1 Clarke's Land Laws, 1006. 8 Peters, 454. 14 Peters, 342,) by which it was determined that the public domain (contrary to the system previously existing) should be no longer ceded gratuitously to settlers, but be " made to serve as an aid to the public necessities." Among the articles of this decree was one directing " the Provincial Deputations to propose to the Cortes, through the medium of the Regency, the time and the terms when it would be most convenient to carry this disposition into effect, in their respective provinces, according to the circumstances of the country, and the lands which it may be indispensable to preserve for the townships, in order that the Cortes may determine upon what may be most convenient to each territory;" and it was further directed that " this business be recommended to the zeal of the regency of the kingdom, and to the two Secretaries of State, in order that they may bring forward and inform the Cortes at all times of the representations which the Provincial Deputations direct to them." 1 Clarke's Land Laws, 1006. This is all that the decree says in regard to the power of the Provincial Deputations. It has no reference, whatever, to grants of the public lands by them. They were required to make reports (as it may be seen that they again were in 1820, when similar changes were again contemplated; (6 Decretos de las Cortes, 345,) on certain points which the Cortes desired to ascertain, in order to perfect the contemplated change in the mode of disposal of the national domain. They were to examine what quantity was to be reserved for township purposes. They were to com--

municate their opinions to the Secretaries of State. These powers and duties were the only ones which the most liberal view of the decree confers on the Provincial Deputations. To construe language such as this, in a decree founded on a system which was to make the public lands "serve as an aid to the public necessities," into a power to grant gratuitously in absolute property, more than ninety thousand acres to a single individual, is to interpret it in a manner warranted by no rules of reasonable or legal construction. It is also to be inquired how any power conferred on the Provincial Deputation at Havana could either be exercised by themselves in East Florida, or be delegated by them to the City Council at St. Augustine; for it was from that body that the grant to Arrambide actually emanated.

But if the Provincial Deputation ever possessed such a power, it was annulled before the grant was perfected. Arrambide did not receive the "expediente," or copy of the proceedings, till the 30th of June, 1814. He was, after that, to "produce the plat of the said lands," and was not to receive his title in form until he did so. On the 4th or May, 1814, Ferdinand VII. resumed the throne of Spain; and among his very first acts was a royal order, dated on that day, restoring the authority of the Captains General and Governors in the provinces; (1 Decretos de Fernando, 7. 13;) succeeded very shortly by other decrees re-establishing the ancient laws and usages in America. On the 4th of June he directed the observance of the laws of the Indies, and the ordinances of the Intendants in regard to the public domain; and during that and the succeeding month several royal decrees to the same effect were promulgated. Decretos del Rey Fernando VII., v. i. 1 Clarke's Land Laws, 1010. 2 White's New Rec., 155. How then could Arrambide produce to the Provincial Deputation, or to the City Council, the plat which he had promised? How could he receive his title in form, or perfect his grant, under a system which was totally annulled? How could it derive validity from the acts of an authority, which, if it ever possessed power to make such a grant, had ceased, by the change of the government, to retain it, even before the time when he received from the notary the evidence of his incipient title? And that such, too, was the opinion of the officers of the Spanish government, who have ever been dis-

posed to countenance, as far as possible, these claims in Florida, is evident from the testimony of the Superior Accountant of Havana; which may be seen in a report made by him in 1824, under a royal order, in relation to grants of land in Florida. He says that no evidence, whatever, was found in regard to this grant in the principal treasury at Havana; and in a report made shortly after, by another of the public authorities, this grant (with the exception of that to Arredondo, which was made some years afterwards, under the royal authority) is declared to be the only one ever known to have been made of land in East Florida by the authorities of Havana. 2 White's New Rec., 378. 380. It may be assumed, then, as beyond a question, that this grant from the Provincial Deputation at Havana, would not have been recognised as "valid, if the territories had remained under the dominion of his Catholic Majesty," and, therefore, that the United States are not bound to ratify and confirm it.

Admit, however, that the Provincial Deputation had the legal right to authorize the City Council of St. Augustine to make the grant, as stated in the testimonial; still, the grant made by the Council, on which the claimant rests his title, is not warranted by it. No description can be more carefully explicit than that which designates the tract intended to be granted by the Provincial Deputation. It is a square of land, comprising two leagues to each cardinal point of the compass, on the south side of New river, reaching down to the sea shore, at the inlet of Puerto Largo, where that river discharges itself into the ocean. This, and this only, the City Council were authorized to "grant in property" to Arrambide. But the resolution of the Council grants him "two leagues of land to the north of the river Miamies, which are on the north-west side of Cayo Biscayno," and that is the tract in which the claimant now asks to be confirmed. The localities are altogether different. The two places are distant from each other sixty or seventy miles. The position, that the location cannot be varied from the description in the grant, unless, as in the case of The United States v. Sibbald, 10 Peters, 321; such variation be expressly authorized; has been repeatedly laid down by this Court. If the claimant abandons his title under the grant of the Provincial Deputation, and relies on that of the City Council of St. Augustine, he is met by two objec-

tions, either of which is fatal.   The Council had no authority, under any law or royal order that has ever been produced, to make grants of land in the territory of East Florida ; and if they had, this grant, which they have here made, is so deficient in a description of locality, that, as in the case of The United States *v.* Forbes, it is impossible to found a decree upon it, in the absence of any return of survey.

4. If the claimant has established, that the grant of the land he claims was, in fact, made in due form, still the validity of his title depended on the survey, occupation, and settlement of it, and the erection of mills.   The concession was not solicited or conferred on account of any services.   In his representation, Arrambide promises " to produce the plat of the lands, as soon as he finds himself prepared to take it out, to commence the establishment which he is to effect."   The survey and demarcation of the land were thus a condition of his own making, in the year 1814 ; until this should be done, he was not prepared to receive his title ; by the existing regulations in regard to grants of public lands, he could not have done so, unless a settlement and survey had been made within a limited period, but, in addition to that, the terms of his own application prescribed their necessity.   In the testimonial of the provincial deputation, it is stated that he solicited a grant of the land, " with the object of establishing on it mills for sawing timber ;" and this is assigned as a reason for granting him a tract so unusually large.   From the claimant's own evidence, as set out in the record, it is apparent that there was an entire neglect to comply with any such conditions.   In 1818, Arrambide told one of the witnesses that " he was going to build mills ;" and in 1824, another witness, who resided near the Miami river, " knew of no mills being erected there" by him. A witness who was there in 1815, " saw two white families and some negroes belonging to the establishment" of Arrambide ; but on returning there, about four years afterwards, he " found but one of the families remaining, and understood that they were there on their own account."   It is not even alleged that, before this abandonment, any survey had been made, or any plat of the lands produced.   " The assignment," says Saavedra, in his first report, in 1818, to Governor Coppinger, " of extensive portions of territory, which have been made for the establish-

ment of factories, to persons who did not then comply, or have not since presented themselves to establish their mechanical works, ought to be considered without any right or value, and said lands declared perfectly free, that they may revert into the class of public lands." And in his second report, made in the following year, he again says, ".as it is certain that many individuals who have obtained such concessions have remained in inaction, without having for so long a period advanced the establishment of said works, it appears just, that such concessions, which have remained in inactivity, should be declared null and of no effect." 2 White's New Rec. 284. 290.

Mr. Downing, for the appellee, stated:

This is a claim for "two leagues of land, to each point of the compass, for the purpose of erecting saw-mills, making, &c., and cutting lumber. The land was granted by the "Provincial Committee," December 4, 1813: the constitution of that day being then in force in the provinces, and said committee having the power to grant lands.

This grant was subsequently approved by Governor Kindelan, and was never annulled.

1. This grant was filed before the Court in time, (4 sec., law of 1830.)

2. It was made by full authority; it was unconditional, and is valid.

Mr. Justice CATRON delivered the opinion of the Court.

The first objection to the decree of the Court below, made in behalf of the United States, is: 1. "That the claim ought not to be sustained; because, neither the claimant, nor those under whom he claims, ever came within the provisions of the act of Congress, applicable to the said claim; or filed any petition, memorial, or necessary documents within the term required by law."

By the act of the 26th of May, 1830, Congress declared, that all claims to lands not settled by that act, and which had been presented to the Commissioners of East Florida, or to the Register and Receiver acting as such, and which had not been "finally acted upon," should be adjudicated and settled as prescribed

by the act of 1828. The final action referred to in the act of 1830, was that of Congress. 7 Peters, 94. So that the claim in controversy is of the description required, and within the jurisdiction of the Courts, by the fourth section of the act of 1830; nor do we find any thing in the act, which precluded the Court below from entertaining the petition for the establishment of the claim, on the ground that it had not been filed in time. By the act of 1828, c. 70, s. 12, it was declared, that claims not brought before the Courts within one year from the date of that act, should be forever barred: and thus stood Delespine's claim, when the act of 1830 was passed. This act has no direct limitation in it; nor is it open to inquiry in this case, whether a limitation can be implied; because the petition was filed in November, 1830, within one year after the date of the act: and although the first petition was informal, and defective in substance, still, it would be too strict, to say it was not the commencement of the proceeding, but that the amendment allowed by the Superior Court, in November, 1833, should be taken as the date when the claim was first preferred.

It had been filed before the commissioners for adjudicating the Florida land claims, as early as 1825, we are informed by the petition; and reported to Congress, with a recommendation, that it be confirmed. This fact is not denied, or controverted; and which we take to be true.

2. It is insisted that the evidence in the cause is insufficient to prove that the alleged grant or concession was ever made.

It appears, that on the 28th day of May, 1813, Arrambide applied to the Provincial Deputation, at Havana, for two leagues of land to each point of the compass, making ninety-two thousand one hundred and sixty acres; that, on the 4th of December, 1813, the Deputation stated to the Council of St. Augustine, that it granted the land to Arrambide.; and referred the grantee to the Council, with a command to the Council to expedite to him the title.

The ordinary modes of granting lands in Florida, had been directly, either by the Captain General of Cuba, or the Governor of Florida; but owing to a recent call of the Cortes in Spain, and a re-organization of the Spanish government, existing at the date of the concession; and which state of things lasted only for

2 E 2       42

a short time, the mode of proceeding, in regard to granting the public domain, was changed, and the powers vested in the tribunals known as "the Provincial Deputation." This appears by the royal order of the 4th of January, 1813, found in the United States Land Laws, Appendix, 1006. It was made the duty of the Provincial Deputation, to devise the most convenient means of making grants; and through the Secretaries of State, to report the same to the Cortes, for their recognition and adoption.

The Deputation at Havana assumed the power to grant; and nothing appearing to the contrary of the existence of the power in that body, and the concession made at Havana, not being opposed to the royal order of January, 1813, and there being no occasion, in this case, to inquire into the powers of the Provincial Deputation; we have treated the testimonial as emanating from the proper authority, leaving the point open to future inquiry, should an occasion call for it, and positively require us to decide whether the Deputation had the power assumed.

It was necessary to state thus much of the case, and of the then state of the Spanish tribunals and history, preparatory to discussing the effect of the proofs intended to establish that the grant had in fact been made.

Jose Leal, representing himself as a notary at Havana, certifies, that on the 13th of January; 1814, he had recorded the original memorial of Arrambide, and the documents accompanying the same, with the testimonial, or concession; a record of which he testified in presence of two witnesses. This record purports to have been made pursuant to the order of the Captain General, on the petition of Arrambide. Thus authenticated, the testimonial of the grant appears to have been presented to the Council of East Florida; but none of the accompanying documents, so far as can be seen, or inferred from the record before us, were presented.

On the 1st day of February, 1814, the Council acted upon the testimonial, but granted lands at a different place from the one therein expressed.

On the 3d of June, 1814, Fntralgo, the Secretary, says, "This is a copy." And on the 6th of June following, Ygninez and

Lopez, styling themselves Royal Collector, and Treasurer, certify to the official character of Entralgo.

How far the forms of these certificates could have been called in question, in the Supreme Court, it is difficult to say; no objection, however, on the hearing in that Court, was made to the introduction of the testimonial given the interested party at Havana; nor to the resolution taken thereon by the Council at St. Augustine; and we therefore do not feel ourselves justified in rejecting them on this appeal, because of the informality in the evidence adduced to the Court below of their existence in the public archives of Florida. The claim had been presented to the American commissioners years before, without objection to the existence of the title by the board, so far as we are informed. But we chiefly rely on this, that from the nature and great extent of the claim, if such an objection had been well founded, or even suspected, it is fair to presume the counsel for the government of the United States would have interposed and demanded of the Superior Court, on the hearing, the rejection of the claim, on the ground that the evidence did not establish its existence.

From any thing that appears to the contrary, the originals of the proceeding had before the Council of St. Augustine, in 1814, may have been before the Court, and admitted in evidence without objection.

Furthermore, the authenticity of the testimonial made in Arrambide's behalf, at Havana, was sanctioned by the Council of St. Augustine, in March, 1814; that was the tribunal to judge of its character as evidence: and having been treated as an existing and authentic act, this Court cannot, with any propriety at this day, hold otherwise; especially, as not the slightest suspicion attaches to the authenticity of the title papers, such as they are found in the record.

3. Having disposed of the exceptions taken to the existence of the title, we will next inquire what the effect of the testimonial was. We will take for granted that the papers on their face, considered in connexion with the royal order of January 4th, 1813, sufficiently establish the fact, that the power to grant at the particular time when the grant was made, was in the Provincial Deputation at Havanna, and not in the Council of the city of St. Augustine. The Council had imposed on it the duty

" to despatch the corresponding title" to the lands granted by the Deputation. And to this end, and with this request, by the petition of Arrambide, was the testimonial laid before the Council in the present instance.

After the title in form was despatched, the proceedings were to be returned to the Provincial Deputation; conforming in this respect to the 12th and 17th articles of the royal order. The resolution of the Council must, therefore, found itself on the testimonial. The Provincial Deputation stated to the Council, " That they granted in property to Arrambide, two leagues square to each point of the compass, of the lands he may choose, from the mouth of New river, which discharges itself on the coast of East Florida, and through Puerta Largo, on the south part, following the same course to the sea shore; conforming as near as possible to the said decree."

New river, and the inlet through which it passes into the ocean, are well known in the geography of East Florida; lying north of the twenty-sixth degree of latitude, on the eastern coast, Fort Lauderdale being now established at the mouth of that river. From the mouth of this river the interested party was authorized to choose the land; and we apprehend it was to be taken on the south part of the river, and was certainly partly on the ocean.

On the 1st of February, 1814, Arrambide, by his petition dated at Havana, solicited the Council of the city of St. Augustine, to expedite to him the title in conformity to the grant of the 4th of December, 1813, in the territory of the province of East Florida; and on the south part thereof.

' The testimonial leaving," says he, " to my choice, the place where I should settle myself; and desiring to possess two leagues to the north of the river Miamies, which is at the north-west side of Largo Byscayno, I pray your honours to be pleased' to expedite to me the corresponding title of property for the two leagues of land to each point of the compass, agreeably to this situation: reserving to myself to produce the plat of the said lands, as soon as I find myself prepared to take it out, to commence the establishment; which I am to effect."

The Miamies is a river also well known in the geography of East Florida, and lies about one degree of latitude south of the New river; and at the mouth of which is now Fort Dallas.

The grant made at Havana, was " with the object of establishing on it mills for sawing timber ;" such was the representation made by Arrambide to the Deputation, as we are bound to infer from the papers adduced; although the representation does not appear in the record. No survey has ever been made at the mouth of New river; nor could any be made, unless ordered by the Council of St. Augustine; nor has the proposed establishment been made at that or any other place.

On applying to the Local Council of East Florida, Arrambide abandoned his first location, and claimed to select another, in the neighbourhood of a river lying sixty or seventy miles further south. Of the abandonment there can be no doubt. No claim is set up, in the petition, for the land at the mouth of New river, as granted by the Provincial Deputation.

To the grant at Havana, the rule applies which was laid down by Saavedra at the command of Governor Coppinger, in answer to the inquiries of the agent of the Duke of Allegon, and recited in the case of The United States v. Clarke, 8 Peters, 461; that " The assignments of extensive portions of territory, which have been made for the establishment of factories, to persons who did not then comply, nor have since presented themselves to establish their mechanical works, ought also to be considered without any right or value; and said lands perfectly free, that they may revert into the class of public lands." The opinion and report, from which the foregoing is an extract, was recognised as authority by this Court, in the case of The United States v. Wiggins, 14 Peters, 351; and we imagine its accuracy is indisputable. We therefore think, from the facts presented by the record, as also by the laws of Spain, the grant made at the mouth of New river, by the Provincial Deputation, imposed no obligation on the government of Spain, at the date of the treaty of 1819, to confirm the title to Arrambide ; and that none rests on the government of the United States, as the successor to the rights and obligations of Spain.

4. Did the concession, made by the Council at St. Augustine, confer any title ? It was professedly made in conformity to the authority of the testimonial and decree of the Provincial Deputation of Cuba; and could only be intended to expedite the formal title. The Council neither had, or professed to have in

itself, the power to make a new and independent grant to Arrambide; thereby disregarding the commands of its superiors, and of the laws and regulations recently adopted for the government of the provincial authorities, when granting lands. The concession was, therefore, void, for want of power in the tribunal that assumed to make it.

This Court say, in the case of the United States v. Clarke, 8 Peters, 454, 455, that the royal order of the 4th of January, 1813, founded on the decree of the Cortes, seems to have been repealed on the 22d of August, 1814. That it was annulled by the King about that time, there can be no doubt; and it may be, the title of Arrambide would not have been recognised by Spain, after the repeal. So it may have been impossible for him to make the survey, or return the proceedings to the Deputation of Havana, according to any known law, after the repeal; that he had no time to do so, between the 22d of March, 1814, when the Council made the concession, and the 22d of August of that year, when the repeal took place, may be safely assumed: yet, with the very slight information we have on this subject, and of those times in the history of Spain, it has been deemed proper not to institute an inquiry into the effect of the repeal of the royal order of 1813.

The decree below, is for a square of land of twelve English miles; the centre of the tract, to be two leagues northward from the mouth of the Miamies, and two leagues from the sea coast; the lines of the survey to be to the cardinal points of the compass.

The petition of Arrambide, asked of the Council of East Florida, two leagues to each point of the compass, "to the north of the river Miamies." That the land was to have been selected in the neighbourhood of some part of the river, and north of it, is sufficiently plain; but whether near the ocean, or near what other part of the river, does not appear, and for an obvious reason, the grantee reserved to himself, "the right to produce the plat of the said lands, as soon as he found himself prepared to take it out, and to commence the establishment which he was to effect." This was never done, and no particular lands could have been decreed to Arrambide; had the Council at St. Augustine possessed the power to grant. The

doctrine on this subject is stated in several cases decided at the present term; and which need not be repeated. It was not possible for the Superior Court to locate any land, as no particular spot was granted; lands not previously granted, were, by the treaty, vested in the United States, as part of the public domain; the public domain cannot be granted by the Courts; this, the decree below attempted to effect: and on this ground, was there no other objection to the decree, it should be reversed; which is ordered; and that the petition be dismissed.

This cause came on to be heard, on the transcript of the record from the Superior Court, for the Southern Judicial District of Florida, and was argued by counsel: On consideration whereof, it is ordered and decreed by this Court, that the decree of the said Superior Court in this cause be, and the same is hereby, reversed and annulled, and that this cause be, and the same is hereby, remanded to the said Superior Court, with directions to dismiss the petition of the claimant.