**BOLSHANIN et al. v. ZLOBIN et al.**

No. 5648–A.

District Court, Alaska.

First Div., Juneau.

March 27, 1948.

R. E. Robertson and M. G. Monagle, both of Juneau, Alaska, for plaintiffs.

Howard D. Stabler, of Juneau, Alaska, for defendant John Zlobin.

FOLTA, District Judge.

This is a representative action brought by plaintiffs, as members, against Zlobin, as priest of what is commonly referred to as the Russian Church at Sitka, and Pashkofsky, as Metropolitan Theophilus of the Greco-Russian Church in America, seeking to recover possession of real property, consisting of land and church buildings erected thereon.

The complaint alleges that plaintiffs are resident members and, except the plaintiff Panamarkoff, also trustees of the church, and that they are also the directors of the Greek Orthodox Church Corporation of Sitka, organized by the church members in 1935, and that as members they and those whom they represent have succeeded to all the rights of the members of the church at the time of the cession of Alaska to the United States in 1867; that by virtue of the Treaty of Cession the members are the owners in fee simple and entitled to the possession of all the land described in the patent of July 27, 1914, a copy of which is attached to and made a part of the complaint, together with all the buildings erected thereon, and furnishings; that the title conveyed by the patent to the archbishop of

the church is subject to the superior title of plaintiffs and members under the grant referred to, and that the members, including plaintiffs, are the beneficiaries of the trust created by the patent; that plaintiffs and members have been ousted from the possession of the property described, to their damage in the sum of $5,000.

Defendants have demurred to the complaint on every ground enumerated in the Code, but lack of merit in some of these and the ruling of the Court on the principal objection, that the complaint fails to state a cause of action, render a consideration of the remaining grounds unnecessary.

Plaintiffs claim title under Article II of the Treaty of Cession, 15 Stat. 539, 541, which provides that:

"In the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property. It is, however, understood and agreed, that the churches which have been built in the ceded territory by the Russian government, shall remain the property of such members of the Greek Oriental Church resident in the territory, as may choose to worship therein."
and they contend that this constitutes a grant to the members of the church to whose rights they have succeeded.

Defendants on the other hand claim title under the patent of July 27, 1914, issued to the archbishop of the church, "his successors and assigns, forever, trustee", and contend that at most the treaty provision quoted recognized the ownership of the churches only and a mere possessory right in the land occupied thereby, and that, therefore, legal title in plaintiffs, a prerequisite to an action of this kind, is lacking.

Plaintiffs' answer to this is that the patent is a nullity, not only because of the grant to the members aforesaid, but also because neither the act of June 6, 1900, 31 Stat. 330, 48 U.S.C.A. § 356, nor any other act authorized the issuance of the patent on which defendants rely. However, plaintiffs further assert that, if they are in error as to this, the patent merely created a dry or passive trust under which the patentee was a mere depository of the naked legal title, with no duty to perform, in consequence of which the legal title was transferred to plaintiffs upon the issuance of the patent.

The question which emerges from these and subsidiary contentions is whether the legal title is in plaintiffs either under the Treaty of Cession or by virtue of the execution of the trust created by the patent, or in defendants under the patent.

It is admitted that the church involved in this controversy is, regardless of the many names by which it has been known, as set forth in the complaint, the Greek Oriental Church referred to in Article II of the Treaty of Cession, supra.

Contemporaneously with the transfer of Alaska to the United States, inventories were prepared by the commissioners appointed for that purpose, in which the properties to be transferred to the United States and those to be retained by private individuals were separately listed. The latter class was further divided into (1) property of the Greco-Russian Church, (2) property held under fee simple title, with the names of the owners, and (3) property held by possessory rights only. These inventories, designated B, C and D, respectively, together with a map of Sitka, upon which the properties referred to were shown and identified, were attached to and made a part of the protocol of transfer. Callsen v. Hope, D.C.Alaska, 75 F. 758, 762; Kinkead v. United States, (Alaska), 150 U.S. 483, 487, 489, 14 S.Ct. 172, 37 L.Ed. 1152. At the same time the commissioners issued certificates of title to the individuals who held by fee simple title. It is significant that the Greco-Russian Church was not listed in Inventory C, consisting of property held under a fee simple title, nor has such a certificate of title or any record of grant been pleaded.

■ In accordance with the Treaty the cession included all ungranted lots in Sitka. Manifestly, in the absence of a grant to the Greco-Russian Church these ungranted lots would include those on which the churches stood, and the Greco-Russian Church, as in the case of others who had no fee simple

title, held by right of possession only. Haltern v. Emmons, D.C.Alaska, 46 F. 452, 454, 456, affirmed 159 U.S. 252, 15 S.Ct. 1039, 40 L.Ed. 142.

Further support for this view may be found in the decisions of the Supreme Court upon similar questions arising under treaties with other nations ceding territory to the United States. At the outset it may be noted that private rights of property, whether absolute or merely equitable, are not affected by a change of sovereignty. Soulard v. United States, 4 Pet. 511, 7 L.Ed. 938. But the United States has always maintained that, although a title to land that was perfect and complete at the time of the cession would be fully protected by the treaty, yet, as to land to which the claim rested on an imperfect or incomplete title, the legal title remained in the United States until confirmed or patented. Ainsa v. New Mexico & A. R. Co., 175 U.S. 76, 20 S.Ct. 28, 44 L.Ed. 78. In dealing with such titles Congress has provided for their establishment by statute, in courts of justice, or in the Land Office or before boards. Menard's Heirs v. Massey, 8 How. 293, 12 L.Ed. 1085; United States v. Sandoval, 167 U.S. 278, 290, 17 S.Ct. 868, 42 L.Ed. 168. And the Supreme Court has consistently held that judicial tribunals in the ordinary administration of justice have no jurisdiction or power to deal with such claims, that power being reserved to the political department. West v. Cochran, 17 How. 414, 15 L.Ed. 110; United States v. City of Santa Fe, 165 U.S. 675, 714, 17 S.Ct. 472, 41 L.Ed. 874; Astiazaran v. Santa Rita Mining Co., 148 U.S. 80, 13 S.Ct. 457, 37 L.Ed. 376; United States v. King, 3 How. 773, 11 L.Ed. 824; United States v. Sandoval, supra, the Court saying, in the last case cited, that:

"The duty of protecting imperfect rights of property under treaties such as those by which territory was ceded by Mexico to the United States in 1848 and 1853, in existence at the time of such cessions, rests upon the political and not the judicial department of the government."

Accordingly it became well settled that no claim would be recognized unless based on a grant, concession, warrant or order of survey for some tract of land described therein and capable of location and located by a survey made before the change of sovereignty. Thus in United States v. King, 3 How. 773, 11 L.Ed. 824, in an ejectment action brought by the United States in which the defendants' claim of title was based on an instrument alleged to be a grant from the civil governor of Louisiana, the Court said, 3 How. at page 786, 787, 788:

"It has not the aid of any authentic survey, to ascertain and fix the limits of the land, and to determine its location. The instruments themselves contain no lines or boundaries, whereby any definite and specific parcel of land was severed from the public domain; and it has been settled, by repeated decisions in this court, and in cases, too, where the instrument contained clear words of grant, that if the description was vague and indefinite, as in the case before us, and there was no official survey to give it a certain location, it could create no right of private property in any particular parcel of land, which could be maintained in a court of justice. It was so held in the cases reported in 15 Peters [United States v. Forbes, 15 Pet. 173, 184, 10 L.Ed. 701; Buyck v. United States, 15 Pet. 215, 10 L.Ed. 715; O'Hara v. United States, 15 Pet. 275, 10 L.Ed. 737; United States v. Delespine, 15 Pet. 319, 10 L.Ed. 753], and in 16 Peters [United States v. Miranda, 16 Pet. 153] 159, 160 [10 L.Ed. 920]. After such repeated decisions upon the subject, all affirming the same doctrine, the question cannot be considered as an open one in this court."

"In the case of Choteau v. Eckhart, 2 How. 344, 375, 11 L.Ed. 293, this court decided that an imperfect title derived from Spain, before the cession, would not be supported against a party claiming under a grant from the United States, unless it had been confirmed by act of Congress. The same point was again fully considered and decided, at the present term, in the case of Hickey and others v. Stewart and others [3 How. 750, 11 L.Ed. 814]. These decisions stand upon the ground that such titles are not confirmed by the treaty itself so as to bring them within judicial cognisance and authority; and that it rests with the political department of the government to

determine how and by what tribunals justice should be done to persons claiming such rights."

In Maguire v. Tyler, 8 Wall. 650, at page 660, 19 L.Ed. 320, involving a French grant, the Court said:

"Where the documentary evidence of title produced by the claimant contains no sufficient lines or boundaries to show that any definite and distinct parcel of land was severed from the public domain, the universal rule as settled by repeated decisions of this Court is that the concession in such a case creates no right of private property in any particular tract of land which can be maintained in a court of justice without an antecedent survey and location."

In Greer v. Mezes, 24 How. 268, 16 L.Ed. 661. Mezes, claiming under a patent from the United States, sought to eject Greer, who claimed under a grant specifying nothing as to quantity but describing the land and providing for delivery of possession and admeasurement according to Spanish law. In affirming judgment for Mezes the Court said, concerning the grant:

"This grant had never received sanction of the Departmental Assembly, nor had possession ever been delivered, or any precise boundaries ascertained by survey; and although confirmed as a valid, equitable claim by the District Court, it has never been surveyed nor patented. The claim is therefore not yet completed into a legal title. Its boundaries and quantities still remain uncertain and undefined."

■ To the same effect are: Smith v. United States, 10 Pet. 326, 9 L.Ed. 442; Wherry v. United States, 10 Pet. 338, 9 L. Ed. 446; Buyck v. United States, 15 Pet. 215, 10 L.Ed. 715; United States v. Delespine, 15 Pet. 319, 10 L.Ed. 753; United States v. Miranda, 16 Pet. 153, 10 L.Ed. 920; United States v. Lawton, 5 How. 10, 12 L.Ed. 27; United States v. Boisdore, 11 How. 63, 13 L.Ed. 605; United States v. Domingo Acosta, 1 How. 23; United States v. Percheman, 7 Pet. 51, 86, 87, 8 L.Ed. 604; Ainsa v. New Mexico & A. R. R., 175 U.S. 76, 80, 81, 20 S.Ct. 28, 44 L.Ed. 78; Maish v. Arizona, 164 U.S. 599, 608, 17 S. Ct. 193, 41 L.Ed. 567; United States v. Sandoval, 167 U.S. 278, 290, 17 S.Ct. 868,

42 L.Ed. 168; Arivaca Land & Cattle Co. v. United States, 184 U.S. 649, 22 S.Ct. 525, 46 L.Ed. 731; Slidell v. Grandjean, 111 U. S. 412, 4 S.Ct. 475, 28 L.Ed. 321. In the case last cited it was held that a legislative confirmation of a grant of land of which no quantity is given, no boundary stated and no rule for its ascertainment furnished, is void for uncertainty, 111 U.S. at pages 439, 440, 4 S.Ct. at page 488, 28 L.Ed. 321. The principle, that the perfection of equitable or incomplete titles awaited the action of the political department, was also recognized in 22 L.D. 330, 336, and 25 L.D. 480, 487, in dealing with the rights of the Greco-Russian Church in the land involved in this dispute.

■ Plaintiffs' claim is not unlike that adversely disposed of in Del Pozo v. Wilson Cypress Co., 269 U.S. 82, 87, 89, 46 S.Ct. 57, 70 L.Ed. 172, that the patent was merely in the nature of a convenient muniment of title or record of confirmation effected by the treaty of cession, rather than a conveyance effective from the date of its execution. Such a claim necessarily presupposes a grant from the preceding sovereign, but in the instant case its only foundation is the treaty stipulation. This falls far short of constituting a grant. Pico v. United States, 2 Wall. 279, 17 L.Ed. 856; Peralta v. United States, 3 Wall. 434, 18 L. Ed. 221; United States v. Gomez, 3 Wall. 752, 18 L.Ed. 212; Palmer v. Low, 98 U.S. 1, 25 L.Ed. 60; 42 A.J. 787, Sec. 6; 50 C.J. 1208, Sec. 660. In Foster v. Neilsen, 2 Pet. 253, 7 L.Ed. 415, Chief Justice Marshall had occasion to point out the nature and effect of such a treaty stipulation. Foster claimed title to land under a Spanish grant which he alleged was confirmed by the 8th Article of the Treaty with Spain. There was no act of Congress authorizing the suit or conferring on the Court any extraordinary powers with reference to such claims. In disposing of his claim on another ground, the Court, in referring to his contention, said 2 Pet. at page 314:

"In the United States, a different principle is established. Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legis-

lature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court."

Such a stipulation merely provides for the protection of equitable or imperfect titles. In Haltern v. Emmons, 1890, 46 F. 452, 456, which was an action for the recovery of a lot in Sitka for which no certificate of title had been issued in connection with the cession, the Court held that while the treaty recognized an absolute title to the building erected on the lot in dispute, the owner thereof had but a possessory right in the lot. This decision would appear to be decisive of the present controversy unless the specific provision in Article II that the churches should remain the property of the members furnishes an adequate basis for a different conclusion. In my opinion the clause is not susceptible of such a construction. Not only are there no operative words of grant, but the context clearly indicates that the word "property" was not used for the purpose of fixing or defining the character or quantum of title, but rather to protect such right of property as the church then had. That it is just as applicable to an imperfect or equitable as to a complete title clearly appears from what was said by Chief Justice Marshall in Soulard v. United States, 4 Pet. 511, 7 L.Ed. 938, to the effect that the term "property", as used in the treaty by which Louisiana was acquired, comprehended every species of title, inchoate or complete, and embraces rights which lie in contract, executory as well as executed, and in United States v. Arredondo, 6 Pet. 691, 8 L.Ed. 547, involving a Spanish grant and the construction of the treaty with Spain, the Court pointed out, 6 Pet. at page 711, 8 L. Ed. 547, that "it is the usage of all civilized nations of the world, when territory is ceded, to stipulate for the property of its inhabitants." To the same effect is Hornsby v. United States, 10 Wall. 224, 240, 19 L.Ed. 900. It has always been the policy of the United States to recognize inchoate and incomplete titles upon a cession of land and to provide for their confirmation by statute, decree or patent.

There is nothing novel about Article II of the Treaty with Russia. Upon comparison with other treaties of cession, it will be found that there is a marked similarity except as to the manner of adjudicating equitable claims. It was perceived that these were so few in number, not only by reason of the small white population, but by reason of the stipulation against encumbrances, etc. in Article VI, that the setting up of special tribunals to inquire into and adjudicate claims in Alaska was deemed to be unnecessary.

By way of contrast attention may be directed to the Court's definition of complete titles, in Maish v. Arizona, 164 U.S. 599, 608, 17 S.Ct. 193, 197, 41 L.Ed. 567, to-wit: " 'Perfect grants,' * * * (that is, grants absolute and unconditional in form, specific in description of land, passing a title from the Mexican Government to the grantee as certain, definite, and unconditional as a patent to a similar tract from the United States) * * *."

As distinguished from imperfect and incomplete titles a grant from a former sovereign needs no confirmation. The treaty itself is sufficient. United States v. Percheman, 7 Pet. 51, 86, 87, 8 L.Ed. 604.

In Ainsa v. New Mexico & A. R. R., 175 U.S. 76, 80, 81, 20 S.Ct. 28, 44 L.Ed. 78, it was pointed out that a title which was complete and perfect when the treaty took effect is protected by the treaty and is independent of any legislation by Congress and requires no proceeding in court to give it validity.

The view that the treaty stipulation is not sufficient to constitute a grant is further strengthened by other considerations. It had to be adopted by the Land Department before the patent of July 27, 1914, was issued to the church under the act of June 6, 1900, which incidentally was the further action of the political department uniformly held by the Supreme Court to be required before incomplete or equitable titles in ceded territory may be confirmed. That such was also the view of the War, State and Treasury Departments appears from

the following excerpt from the decision in 22 L.D. 330, 336, with reference to these church lands:

"Nevertheless, while Congress has made no provision for determining the extent of the claims of this church, nor the validity of its title, the War, State and Treasury Departments appear to have always protected, by virtue of the second article of the treaty, the possessory claims of the Greco-Russian Church and private individual holdings from Russia."

It is also worthy of note that the bishop formally requested a survey of and confirmation of title to the church lands in Alaska, 22 L.D. 330, and that in response thereto the Land Department said, 22 L.D. 336, that:

"Congress has not provided any method by which the extent or title of these claims can be determined and until then this department cannot pass upon them."

And in 25 L.D. 480, 487, it was said:

"No commission can be appointed to survey and determine the boundaries of church lands in Alaska, nor can any confirmation of existing church title be made without further action by Congress."

This would appear to be ample proof that the title of the church to the land was deemed to be a mere possessory one.

Both parties, however, point to language in the opinion of Assistant Attorney General Van Devanter of December 11, 1897, 25 L.D. 480, which they contend supports their view of the construction to be given Article II of the Treaty. It is the opinion of the Court that correctly construed, the opinion holds that the title of the church at the time of the cession was, so far as the land occupied is concerned, merely a possessory title. This conclusion is unavoidable in view of the consistent attitude of the Land Department that the title thereto could not be confirmed without further action of Congress, which is utterly inappropriate language when dealing with fee simple titles. It appears that by the time the act of June 6, 1900, 31 Stat. 330, was passed, the claim of the church was enlarged so that when application was made for patent the church claimed not only the land held by possessory rights at the time of the ces-

sion, but additional land which it is presumed was subsequently occupied and used in connection with the church.

These decisions of the Land Department standing alone would be entitled to much weight, but they are supported by a long line of precedents to the effect that a title, which is imperfect and incomplete because the land claimed is neither described sufficiently nor capable of location, cannot be recognized in any court of justice until it has been confirmed and a patent issued.

It is manifest, therefore, that plaintiffs' contention that the treaty stipulation constitutes a grant, cannot be sustained. It merely recognized a possessory right in the land on which the churches stood and, since the land was not described, the title was imperfect and incomplete within the doctrine of the decisions cited and necessarily remained so until the political department took further action. Newhall v. Sanger, 92 U.S. 761, 764, 23 L.Ed. 769. This was done with the passage of the act of June 6, 1900, which provides:

"The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands actually in their use or occupation on June 6, 1900, and the land, at any station not exceeding six hundred forty acres, occupied on said date as missionary stations among the Indian tribes in the section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which the missionary stations respectively belong, and the Secretary of the Interior is directed to have such lands surveyed in compact form as nearly as practicable and patents issued for the same to the several societies to which they belong; but nothing contained in this chapter of this title shall be construed to put in force in the district the general land laws of the United States."

██ It was not until then that the title could be perfected. But before a patent could be issued, it was necessary for the Land Department to determine what lands were subject to disposal, the extent of use and occupancy for church purposes, to make a survey thereof, and fix the boundaries. Incidentally, it may be observed that the

pleading of the patent issued to the defendants' predecessor, instead of a record of the alleged grant, would appear to be inconsistent with the theory of a grant. The patent that was issued to the archbishop of the church was, therefore, not merely confirmatory of a previously existing complete title, but was the grant of a fee simple title of the land described therein. 'Langdeau v. Hanes, 21 Wall. 521, 531, 22 L.Ed. 606.

■ The remaining question is whether the legal title vested in the trustee by the patent has been transferred to the beneficiaries. This involves an inquiry into several subsidiary questions: (a) Whether the trust created by the patent is dry or passive; (b) whether the statute of uses is in force in Alaska as part of the common law; and (c) whether, notwithstanding, such a statute applies to a trust for religious purposes. The statute, Sec. 971 et seq., C.L.A. 1933, under which the society was incorporated in 1935, is very general in terms and silent as to the effect of incorporation upon the title to the church property. However, it would appear that a transfer of the legal title is not effected by incorporation in the absence of specific statutory provision. First Baptist Church v. Witherell, 3 Paige 296, 24 Am.D. 223; Baxter v. McDonnell, 155 N.Y. 83, 49 N.E. 667, 40 L.R.A. 670, 674; Reorganized Church of Jesus Christ of Latter-Day Saints v. Church of Christ, C.C., 60 F. 937.

Conveyance of the legal title to the spiritual head of the church is a fairly common practice and appears to be in vogue in the case of the Moravian and the Roman Catholic Churches, Mannix v. Purcell, 46 Ohio St. 102, 19 N.E. 572, 2 L.R.A. 753, 15 Am. St.Rep. 562; Baxter v. McDonnell, supra. Since, historically at least, there was very little difference between the Roman and Greek Catholic Churches, and no decision has been found holding that a conveyance in that form creates a dry or passive trust, it would not seem unreasonable to assume that the absence of any authority on this question tends to support the view that the trust is an active one. Cf. Carrick Borough v. Canevin, 243 Pa. 283, 90 A. 147; Britton v. Jackson, 31 Ariz. 97, 250 P. 763.

■ In the instant case title was conveyed to the "Archbishop of the Russian-Greek Eastern Catholic Orthodox Church of North America, trustee, and to his successors and assigns forever." This implies the power of disposition, which alone would make the trust an active one. Apparently another reason that the legal title was conveyed in trust to the archbishop was because the church was not a legal entity. Moreover, it is entirely possible that the archbishop, under the system of government of the church, is the temporal as well as spiritual head, and that a separation of the legal and equitable titles was deemed desirable if not necessary. Be that as it may, it appears that the trust created is concerned with more than the bare title; that it was the intention to separate the legal from the equitable title, and that the immediate use and possession were not to go to the beneficiaries. These facts would appear to bring the case within a well-recognized exception to the rule. Ann. 78 Am.D. 406–7.

■ But assuming that it is a dry and passive trust, and assuming further, without deciding however, that the statute of uses is in force in Alaska as a part of the common law, yet it is my opinion that that statute is not applicable to trusts for religious purposes. In re Stewart's Estate, 26 Wash. 32, 66 P. 148; Harrington v. Pier, 105 Wis. 485, 82 N.W. 345, 50 L.R.A. 307, 76 Am.St. Rep. 924, 930; 54 C.J. 57, Sec. 117.

■ I am, therefore, of the opinion that plaintiffs do not have the requisite legal title to maintain this action. Haltern v. Emmons, D.C., 46 F. 452; Menard's Heirs v. Massey, 8 How. 293, 306, 12 L.Ed. 1085; Dent v. Emmeger, 14 Wall. 308, 312, 313, 20 L.Ed. 838; Langdeau v. Hanes, 21 Wall. 521, 22 L.Ed. 606; More v. Steinbach, 127 U.S. 70, 32 L.Ed. 51. It follows that the demurrer to the complaint must be sustained, and it is so ordered. This makes it unnecessary to pass upon the question of misjoinder.