## The United States, Appellants, *v.* The Heirs of John Forbes, Appellees.

John Forbes, by memorial to Governor Kindelan, the Governor of East Florida, set forth, that, in 1799, there had been granted to Panton, Leslie, and Company, for the purpose of pasturage, fifteen thousand acres of land, which they were obliged to abandon, as being of inferior quality. Forbes, as the successor to these grantees, asked to be permitted to abandon these fifteen thousand acres, and, in lieu, to have granted to him ten thousand acres, as an equivalent, on Nassau river. The petition avers, that the object was to establish a rice plantation. The petition was referred to "the Comptroller," who gave it as his opinion, that the culture of rice should be promoted. Governor Kindelan permitted the abandonment of the fifteen thousand acres granted before, and in lieu thereof, granted to John Forbes, for the object of cultivating rice, ten thousand acres in the district, or banks of the river Nassau. Surveys of seven thousand acres of land, at the head of the river " Little St. Marys" or " St. Mary," and three thousand acres in " Cabbage Swamp," were made under this grant. No description of the locality of the land, other than that in the certificate of the survey, was given; nor do the surveys prove, that the land surveyed lay in the district of the river Nassau. No evidence was given of the situation of " Cabbage Swamp." Held, that these surveys were not made on the land granted by Governor Kindelan; and, according to the decisions of this Court, on all occasions, the surveys, to give them validity, must be in conformity with the grants on which they are founded ; and to make them the origin of title, they must be of the land described in the grant of the Spanish government.

The cases of the United States *v.* Clarke, 8 Peters, 486. The United States *v.* Huertas, 9 Peters, 171, cited.

The Courts of Justice can only adjudge what has been granted ; and declare that the lands granted by the lawful authorities of Spain, are separated from the public domain : but where the land is expressly granted at one place, they have no power; by a decree, to grant an equivalent at another place, and thereby sanction an abandonment of the grant made by the Spanish authorities. The Courts of the United States have no authority to divest the title of the United States in the public lands, and vest it in claimants ; however just the claim may be to an equivalent for land, the previous grant of which has failed.

The case of the United States *v.* Arredondo, 6 Peters, 691, cited.

The decree of the Supreme Court of East Florida, which had confirmed the grant to John Forbes, reversed.

ON appeal from the Superior Court of East Florida.

The executor of John Forbes, on the 20th of May, 1829, presented a petition to the Superior Court for the Eastern District

P 2

of Florida, claiming ten thousand acres of land, seven thousand of which were surveyed on the waters of "Little St. -Marys river," in the then district of Nassau, in East Florida; the other tract, being three thousand acres, was alleged to be situated on "Cabbage Swamp," also in East Florida.

The petition stated, that the grant for the land was made by Governor Kindelan, in lieu of fifteen thousand acres which had been surrendered by John Forbes to the King of Spain.

The petition contained the "Memorial for grant," which was presented on the 27th July, 1814, to Governor Kindelan, by John Forbes. It was with the proceedings, and as follows:

HIS EXCELLENCY THE GOVERNOR:

I, Don Juan Forbes, partner of the firm of Juan Forbes and Company, successors of Panton, Leslie, and Company, merchant of this province, with the greatest respect, appears before your excellency, and says, that the said firm of Panton, Leslie, and Company obtained, in the year one thousand seven hundred and ninety-nine, a grant of fifteen thousand acres of vacant lands in the district of St. John, in order to employ their slaves in the agriculture and for grazing their cattle. as is seen by the certificate annexed; but after a short time, they were under the necessity to abandon them, as being of an inferior quality, the same thing happened to which, which frequently happens-in this province, where the planter does not every time succeed in his choice of land, which he perceives only when a sorrowful experience shows him his error; and as it has been for many preceding years that the government, in attention to similar misfortunes, and to the expenditures and losses which have been incurred, has had the goodness to permit the taking up other vacant lands, provided the prior grant be abandoned. Finding myself situated in the same case, and wishing to establish a rice plantation, which production we have been, until the present time, under the necessity to import from foreign parts: I, from this moment, abandon the said fifteen thousand acres of land in behalf of his majesty, (whom may God have in his holy keeping,) supplicating him to admit it, and in lieu thereof, to grant me an equivalent in the district of Nassau river. Therefore, I supplicate your excellency, be pleased to order that my former abandonment be

received, and, in consequence, that ten thousand acres be granted to me, in said district of Nassau river; the survey of which I will produce, as soon as the tranquillity of the province enables me to execute it.

Which favour, &c.

JUAN FORBES.

On the 27th July, 1814, Governor Kindelan ordered, on the petition, "let the Comptroller inform on the subject."

The Comptroller reported, on the 28th July, 1814, that— "Whereas, in this province, lands are distributed gratis, no record has been entered in the Comptroller's office, of lands so given, nor to whom given, for which reason it is not known what lands have been given, and what remain vacant. Therefore nothing can be said on the subject about which information is required: it appears, however, that it is useful to promote the culture of rice, to which, as the interested party alleges, the lands granted to him the seventh of August, one thousand seven hundred and ninety-nine, for the express purpose of pasturage, as appears by the annexed certificate of the then notary of government, Juan de Pierra, are not adapted."

On the same day, Governor Kindelan made the following "grant," by

DECREE.

St. Augustine, on the twenty-eighth of July, one thousand eight hundred and fourteen. It is permitted to this interested party to give his formal abandonment of the fifteen thousand acres of land, comprehended in the document annexed to the petition, and in lieu of them the ten thousand are granted to him, without prejudice to a third party, for the objects solicited, in the district or bank of the river Nassau; and in consequence, let the corresponding certificate be issued in his behalf from the secretary's office, in order that it may serve him as a title in form, and it will be the duty of the party to produce the plat and demarcations in the proper time, and let the expedient be registered in the secretary's office.

KINDELAN.

On the 23d October, 1816, George J. F. Clark, "the Surveyor-General," certified that he had made "a survey" of seven

thousand acres at the head of the river Little St. Mary's, or St. Mary's river, and annexed "a plat" of the same to his certificate of survey, which, the certificate states, he " keeps in the register of surveys under his charge."

On the 20th October, 1816, George J. F. Clarke certified that he had made a survey of three thousand acres "in Cabbage Swamp, in part of ten thousand acres," granted to John Forbes, in absolute property, and annexed "a plat" of the same to his certificate, as Surveyor-General, and stated "that he keeps the same in the register of surveys under his charge."

After evidence had been taken on behalf of the petitioner and of the United States, the Court confirmed the claim of the petitioner to the extent for the number of acres, and at the place, as in the memorial of the said John Forbes, and the decree of the Governor thereon, is set forth, to wit: " Ten thousand acres of land in the district or bank of the river Nassau."

The United States prosecuted this appeal.

The case was argued by Mr. Gilpin, Attorney-General, for the appellants; and by Mr. Downing, for the appellees.

Mr. Gilpin, the Attorney-General, for the United States.

In this case, the Superior Court of East Florida made a decree in favour of the defendants in error, declaring their title to " ten thousand acres of land in the district or bank of Nassau river," to be valid, under the eighth article of the treaty between Spain and the United States, ratified on the 22d February, 1821, That title is founded on an alleged grant to Juan Forbes, by Governor Kindelan, dated 28th July, 1814, of " ten thousand acres in the district or bank of the river Nassau, for the objects solicited" in the memorial of the applicant; it being, says the grant, " the duty of the party to produce the plat and demarcations in the proper time." The memorial states the wish of Forbes to be permitted to abandon a previous grant of fifteen thousand acres of vacant land, in the district of St. John, on account of its bad quality, and to receive, in lieu of it, as he is desirous "to establish a rice plantation," these ten thousand acres in the district of Nassau river," the survey of which he promises to produce, as soon as the tranquillity of the province enables him to execute it."

[The United States *v.* Forbes.]

The evidence of the claimants was a certificate of Aguilar, the governor's secretary, that a copy of the " expediente," or record of the memorial and grant, had been given to the interested party; a certificate, dated 20th October, 1816, by Clarke, the Surveyor-General, that he had surveyed "for Don Juan Forbes, three thousand acres in Cabbage Swamp, in part of ten thousand acres granted to him by the government;" another certificate, dated 23d October, 1816, by Clarke, that he had surveyed for him "seven thousand acres at the head of the river Little St. Mary's, being the complement of ten thousand acres granted to him by the government;" and a deposition of Sophia Fleming, in which she says she " has heard that Nassau river and the Little St. Mary's are near to each other; that she does not know what district was called Nassau; and that she does not know the distance from Nassau river to Little St. Mary's."

It does not appear that the District Attorney excepted, in the Court below to the evidence of the grant; but, judging from the case as now presented in the record, it may be doubted whether the certificate of the governor's secretary was such a one, or was sustained by such corroborative testimony, as would make it sufficient evidence of title, according to the decision of this Court, in the case of the United States *v.* Wiggins, 14 Peters, 348. In that case, the Secretary certified, on the day of the grant, that " the preceding copy is faithfully drawn from the original, which exists in the Secretary's office, under my charge;" in the present certificate, there is no date, and no averment either that the particular record is a true copy, or that the original does or ever did exist in the Secretary's office. In that case, the corroborative testimony, on which the Court chiefly relied, was a survey in strict conformity to the grant, and referring to its date; in the present, the two surveys agree with the grant in nothing but the quantity; they differ as to the location, and they make no reference to the date.

It is submitted, however, that even if the grant was made by Governor Kindelan, yet Forbes derived no valid title under it, which the Court below was authorized to confirm. He solicited, in his memorial, a grant of ten thousand acres in the district of Nassau river, of which he was to produce a survey; and it was for the purpose of establishing a rice plantation. The grant was

23

made "for the objects solicited," and under the duty imposed upon him "to produce the plat and demarcations in the proper time." There is no proof either that the land was surveyed, marked out, and located according to the grant; or that the conditions of cultivation and settlement were complied with.

I. The grant was made by the Governor, in general terms, as to the district in which the petitioner was to locate the tract conceded to him. The quantity was prescribed, and the district; the particular locality was to be ascertained by the survey which was to be made "within the proper time;" until that should be done, it was in fact but a mere order of survey. The eighth section of the regulations of Governor White, (2 White's New Rec. 278,) which were then in existence, establishes the necessity of an immediate and definite survey; the fourth section requires that possession should be taken within six months: of course the survey must have been made and returned within that period. 2 White's New Rec. 286. What the general provisions of the Spanish law thus required, this grant made more imperative, by expressly imposing the same duty. Has it been performed? No evidence of any survey, agreeing in any respect with the grant, has been produced. The only evidence of a survey is the two certificates of Clarke. Of these, it might be sufficient to say, that they do not purport to have been made under the authority of this grant, or to have reference thereto. But supposing that they were intended so to be, they give the claimant no title. They do not accord with the grant. They are not an execution of the order of the Governor. In the first place, the grant authorizes the location of a single tract; these surveys call for two distinct tracts, at different places. In the next place, the location is to be "on the bank of Nassau river:" yet one tract is in Cabbage Swamp, about the locality of which there is no testimony whatever; and the other is on Little St. Mary's river, about which there is some slight testimony, to the effect, that the witness "has heard it is near Nassau river." This is no location in accordance with the grant. To establish a title to these tracts, the claimant must show that a certificate of survey is equivalent to a grant. He has no better title to them. It is clear, then, that by the Spanish law, the claimant had not perfected his title.

But it is argued that, under the eighth article of the treaty, (6 Laws of United States, 618, 2 White's New Rec. 210,) the grant is not void, but may be still perfected by a survey. To this it is replied, that the provision referred to does not apply to a grant totally void at the date of the treaty; that such was the case in regard to this grant, because the rules of the Spanish law, by force of which alone this land could be severed from the royal domain, never were complied with. At the date of the treaty there was no valid grant to the claimant, in existence. But if there had been, subsequent neglect to comply with the same rules, would have made it void. The treaty, if applicable to such a case, could have extended no farther than to authorize the claimant to perfect his title by a survey, within six months after its date, which he never did.

These positions are fully warranted by previous decisions of this Court. In the case of the United States v. Clarke, 8 Peters, 468, there was a grant of sixteen thousand acres at a place described therein. One survey of eight thousand acres was made within the bounds of the grant; two others for the residue, were made elsewhere. "The grant," say the Court, "conveyed the land described in the instrument, and no other." In the case of the United States v. Huertas, 8 Peters, 491, there were similar surveys, in different parcels, of the number of acres granted; and this Court held " the claim to be valid to the extent, and agreeably to the boundaries as in the surveys," which were conformable to the grant, but invalid as to the rest. In the cases of the United States v. Levy, 8 Peters, 482, and of the United States v. Seton, 10 Peters, 311, the same principle was again affirmed. In the case of the United States v. Sibbald, 10 Peters, 321, the petition contained a clause soliciting permission to locate the quantity asked for, at a different place from that designated, " in the event that this situation will not permit the said form," and the grant accorded to the claimant, " the permission he solicited;" on this ground, the objection, which was taken, that the terms of the grant did not authorize a survey at the place where the party made his location, was not sustained by this Court. In the case of the United States v. Arredondo, 13 Peters, 133, this Court said that the land must be taken as near as might be to where it was granted; that it could not be taken

elsewhere; and that the grant gave no right to any equivalent or another location.   In that case too, the Court held, that where " the description, in the petition of the locality of the concession, was too indefinite to enable a survey to be made," the claimants could " take nothing under the concession."

II. Supposing, however, that the petition, concession, and surveys, are sufficient to give locality to the grant, was the title perfected by the claimant? ' It was not.   The grant was founded on his petition for land, " to establish a rice plantation ;" it was given " for the objects solicited :" they were never accomplished, or attempted.   Independent of this condition, in terms, that arising from the Spanish law was equally imperative.   This was not an absolute grant in consideration of past or future services; it was conferred for purposes of actual cultivation and settlement; the conditions of occupation and improvement, of which the performance is necessary, in such cases, to make the title complete, have been heretofore fully discussed, (United States v. Wiggins, 14 Peters, 340;) and the declaration of Saavedra, formally confirmed by Governor Coppinger, (2 White's New Rec. 284,) that concessions made either to foreigners, or natives, with certificates from the Governor's secretary, were of no value or effect, if the lands granted were abandoned, or not cultivated, has been deliberately recognised by this Court. 14 Peters, 351.

Mr. Downing, for the appellees, contended that the grants of seven thousand acres, and three thousand acres, had been made unconditional, by the Spanish government, on the surrender of fifteen thousand acres which had been granted in another place.

The land was surveyed on the 23d of October, 1816.   He claimed, that by the Florida treaty, by the laws of Congress, and by the decisions of this Court, in similar cases, the grants should be confirmed, and the decision of the Superior Court of Florida should be approved by the Court.

Mr. Justice CATRON delivered the opinion of the Court.

John Forbes, by his memorial to Governor Kindelan, (without date,) sets forth, that in 1799, there had been granted to Panton, Leslie & Co., for the purpose of agriculture, and for grazing

their cattle, fifteen thousand acres of land, in the district of St. Johns, which they were under the necessity of abandoning, as being of an inferior quality : that said John Forbes is one of the firm of John Forbes & Co., successor to Panton, Leslie & Co. And said John Forbes prays to be permitted to abandon the fifteen thousand acres, to the king's domain; and in lieu thereof, to have granted to him an equivalent in the district of Nassau river, to wit : That ten thousand acres be granted to him in said district of Nassau river, the survey of which he will. produce as soon as the tranquillity of the province enables him to execute it.

The petition avers the object was to establish a rice plantation.

The petition was referred to the Comptroller, Lopez, for a report thereon, to Governor Kindelan; the Comptroller reports that records of such grants were not made in his office, and of course he could give no information on the subject; but gives it as his opinion, that the culture of rice should be promoted.

On the 28th of July, 1814, Governor Kindelan permitted the abandonment of the fifteen thousand acres granted in 1799; and in lieu thereof, granted to John Forbes, for the object of cultivating rice, ten thousand acres, in the district, or bank of the river Nassau, and ordered a certificate to issue in the ordinary form, from the Secretary's office, to serve the party as a title in form; making the duty of said Forbes, to produce the plat and demarcation in proper time.

On the 23d of October, 1816, George F. Clarke, the Surveyor, returned, that he had, as Surveyor General of East Florida, surveyed and delineated for Don Juan Forbes, seven thousand acres of land, at the head of the river Little St. Mary's, or St. Mary river; said land being the complement of ten thousand acres, which were granted to him in absolute property, conformably to the annexed plat.

Previously, on the 20th of October, 1816, said Clarke had surveyed for Forbes, three thousand acres in part of the ten thousand acres granted to him, conformably to the annexed plot. This survey was in Cabbage Swamp. But no other description of locality appears, either from the certificate or plat. Nor is there any evidence appearing on the surveys, or by proof, that the lands surveyed lie in the district of the river Nassau, or on the

bank of said river; on the contrary, the seven thousand acre survey is on the river Little St. Mary's, which a woman, Mrs. Fleming, proves she had heard, was near to the Nassau. The situation of Cabbage Swamp does not appear from the record.

The decree of Governor Kindelan contemplated that the tract should be included in one survey; as did the petition of Forbes. Neither of the surveys corresponding with the concession, in regard to the district where the survey could alone be made; and being on lands not granted by the Governor of Florida; the surveys, if confirmed, would be recognised as of themselves appropriations of the lands, independently of the concession on which they profess to be founded; making them the origin of title, and assuming that the surveyor had the power to grant. This Court has on all occasions holden, when the question has been presented, that the survey must be for the land granted by the proper authority. The United States *v.* Clarke, 8 Peters, 468. The United States *v.* Huertas, 9 Peters, 171.

The Courts of justice can only adjudge what has been granted; and declare that the lands granted by the lawful authorities of Spain, are separated from the public domain: but where the land is expressly granted at one place, they have no power by a decree to grant an equivalent at another place, and thereby sanction an abandonment of the grant made by the Spanish authorities. All the public domain of Spain was ceded to this government by the treaty of cession, and the title in fee to the same vested in the United States; from the lands thus acquired, was excepted individual property. First, the paper title to such private property it is our duty to investigate and ascertain, and by our decisions to establish; and secondly, it is our duty to ascertain, and cause to be surveyed and marked by definite boundaries, the lands granted: and here the duties of the Courts end. They have no authority to divest the title of the United States, and vest in a claimant, however just his claim may be to an equivalent. These principles seem to be self-evident; and their assertion not called for, because of their undoubted character: yet the consequences flowing from them, will be found to govern a class of cases of large magnitude, now in the course of adjudication. The one before us is of that class. The concession or grant, (for the terms are synonymous, in regard to the

Spanish titles of Florida,) to Juan Forbes, was for ten thousand acres in the district, or bank, of the river Nassau, with an order, that the concession should serve him as a title in form; "and it will be the duty of the party to produce the plat and demarcations, in the proper time," says the decree of the Spanish governor. That this concession is founded on a past consideration; that is, on the surrender of other fifteen thousand acres previously granted to Panton, Leslie, and Company, admits of no doubt; still, the question recurs, what spot of land was granted? Of the district of Nassau we know nothing, as there is no proof of the existence of such a section of country in the record; unless we infer that it is in the range of country through which the river Nassau runs. But the description is more precise, and authorizes the grantee to take the land on the bank of this river. That there is such a river as the Nassau, in East Florida, lying south of the St. Mary's river, we know from the general geography of the country; it is, however, a river of considerable length; the land might have been located on either bank, from its commencement as a river, to its mouth at the ocean. No survey of the land granted was ever made; the duty imposed upon the grantee to produce the plat and demarcations, in the proper time, was never performed. This was a condition he assumed upon himself; the execution and return of the survey to the proper office, in such case, could only sever the land granted from the public domain. Before, the grantee had an equal right to any lands on either bank of the river Nassau. The concession was made in 1814; and how long the party had the right to survey and make the demarcation, it is needless to inquire, as it has never been done. We apprehend, however, within six months after the ratification of the treaty, by the contracting parties respectively, was the latest date at which the condition to survey could have been complied with: on this point, however, no definite and conclusive opinion is called for, and none is given. Thus situated, the claim was presented to the Superior Court of Florida for confirmation. The Court pronounced the claim valid, that is, that the concession had been made by the lawful authorities of Spain; and it was decreed, that the lands "be confirmed at the place, as in the memorial of the said John Forbes, and the decree of the Governor thereon

set forth, to wit: ten thousand acres of land in the district, or bank of the river Nassau." From this decree, the United States appealed; and in the review of which decree, we are compelled to find the land granted, or to reject the claim, because we cannot identify the land. If this cannot be done, we have no power to decree an equivalent out of the lands of the United States; for the reason, that the Courts have no authority to divest the title of the government, and to vest it in Forbes's heirs. No particular land having been severed from the public domain by John Forbes, his was the familiar case of one having a claim on a large section of country, unlocated; in its nature, and effect, as it regards the government, not differing from the holder of a land warrant in the American states, which might be located by survey at any spot that was not appropriated by an individual title, in a certain district of country. In such a case the government has ever been deemed to hold the fee unaffected by a vested equitable interest, until the location was made according to the laws of the particular country. So here, Forbes acquired no title to any land that can be recognised by a Court of Justice, and his claim must be pronounced void for want of identity; and because it is impossible to settle the identity, and locate the land by a judicial decree.

Although this question has not been directly presented to the Court for decision, yet it did arise, and received our careful consideration, in the cause of The United States v. Arredondo, 6 Peters, 691. In that case, thirty thousand acres had been granted to Arredondo, in 1817, designated to lie on Alligator creek, a branch of the Suwanee, to begin about seven miles west of Alligatortown; situated about forty miles north-westwardly from Paynestown, and about eighty miles from Buena Vesta; which parts of the country are known under the name of Alachua. The Court say—"the land must be taken as near as may be as it was granted, and cannot be taken elsewhere. It (the grant) gives no right to an equivalent or another location; if it cannot be found at, or near, the place designated; an equivalent is not secured by the concession in terms, nor is it by the customs or usages of Spain, nor by any law or ordinance of Spain. And it is proper here to remark, that the acts of Congress for ascertaining claims and titles to land

[The United States v. Forbes.]

in Florida, whilst they recognise patents, grants, concessions, or orders of survey, as evidence of title when lawfully made, do not permit, in case of a deficiency in the quantity from any cause whatever, the survey to be extended on other lands." Detailed and careful instructions are then given how the Court below shall proceed to identify the land; and how it shall be surveyed when the identity is established: and then the Court declare: " If, however, neither Alligator creek can be found, nor any creek to the west of Alligatortown, entering into the Suwanee within seven miles distance from the town, or a reasonable distance therefrom; and if Alligatortown cannot be found; then, it is the opinion of this Court, that the remaining description in the petition, of the locality of the concession, is too indefinite to enable a survey to be made; and that the appellees can take nothing under the concession." Subject to this opinion, and a mandate in conformity to it, the cause was remanded to the Superior Court of East Florida, for further proceedings, in execution of the decree and instructions of this Court; and where it is probably now pending. We think the principle adopted unquestionably correct, and which rules this case.

The petition of Juan Forbes, and the concession of Governor Kindelan, are authenticated and were read in evidence, by the following certificate:

"On the date, a copy of this expediente was given to the interested party above. AGUILAR."

We feel strongly impressed with the deficiency, and unsatisfactory character of the foregoing certificate; but as no objection was made to the introduction of the title papers in the Court below, on behalf of the United States, on the hearing; and as the cause has presented no difficulty on its merits; this preliminary point has been passed over, with this indication; so that in future, the objection may be taken below, should it be deemed desirable to present the question on part of the government, whether such authentication is sufficient to authorize the evidences of title to be read.

We order, the decree of the Superior Court to be reversed, and that the petition be dismissed.

Q 2                    24

[The United States *v.* Forbes.]

This cause came on to be heard on the transcript of the record from the Superior Court for the District of East Florida, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that the grant or concession is void for the want of identity; that it appropriates no land, that the said petitioner has acquired no right or title to any specific land. Whereupon, it is now here decreed and ordered by this Court, that the decree of the said Superior Court in this cause be, and the same is hereby, reversed and annulled; and that this cause be, and the same is hereby, remanded to the said Superior Court, with directions to enter a decree in conformity to the opinion of this Court.