AMBROSE LECOMPTE, APPELLANT, *v.* THE UNITED STATES.

Where the petition for a Spanish concession was for a tract of land without any
definite boundaries, and the petition was referred to the solicitor-general, with
instructions to put the petitioner in possession, if in so doing no prejudice would
result to third persons, this condition required some subsequent action of the gov-
ernment in order to make the grant absolute.

A part of the duty of the solicitor-general was to supervise the severance of the
object to be granted from the royal domain, and apportion the extent of the grant
to the means which the petitioner possessed towards carrying out the objects of the
government.

The preceding decisions of this court have established the doctrine, that, in order to
constitute a valid grant, there must be a severance of the property claimed from
the public domain, either by actual survey or by some ascertained limits or mode
of separation recognized by a competent authority.

In the present case, the proof of occupation, settlement, or cultivation is insufficient.

THIS was an appeal from the District Court of the United
States for the District of Louisiana.

Lecompte claimed under D'Artigau by a chain of title which
it is not necessary to set forth.

On the 31st of July, 1797, D'Artigau presented the following
petition to José Maria Guadiana, then lieutenant-governor and
civil and military commandant of the post of Nacogdoches : —

" Don Juan Baptiste D'Artigau respecfully begs leave to
state to your Excellency that he desires to establish a stock
farm, to raise horses, mares, and horned cattle, at the place
called Lianacoco, within this jurisdiction ; for said object, he
prays your Excellency will please grant him two leagues square
of land at the above-mentioned place, so that in these two
leagues be included or embraced the entire prairie of Lianacoco.
The petitioner solicits this grant for himself, his children, and
assigns, and, from your well-known sense of justice, he hopes
to obtain it.

(Signed,)                                                    J. B. D'ARTIGAU.
" *Nacogdoches*, 31*st July*, 1797."

And on the same day the lieutenant-governor issued the
following order : —

" *Nacogdoches*, 31*st July*, 1797.

" Let this petition be handed to the solicitor-general of this
place, in order that the petitioner be placed in possession of the
land therein mentioned, if in so doing no prejudice can result
to any third party.

(Signed,)                                                    GUADIANA."

The claimant alleged that possession was taken by the
grantee, and continued by those who held under him until the
commencement of the suit.

This claim was twice reported upon by the commissioners appointed by acts of Congress, once in 1816, and again in 1824.

In January, 1816, the commissioners reported (3 American State Papers, 88) that Madame Louise Porter filed with the board of commissioners her claims, as assignee of D'Artigau; also the testimony of Gaspard Boudin, taken before the board, that, about thirteen or fourteen years ago, (viz. about 1802 or 1803,) Madame Monet had possession of this land in exchange for another tract with D'Artigau, and that she put Jaques, an Englishman, on it, and that it had been inhabited and cultivated ever since.

The board, at page 91, report, that this tract is, with others emanating from the Spanish authorities at Nacogdoches, west of Rio Hondo, in the disputed territory; that they have had no means of acquiring satisfactory information of the powers and authorities of the Spanish officers at that place, and therefore decline a decision upon those claims.

On the 3d of March, 1823, Congress passed an act (3 Stat. at Large, 756, ch. 30), relative to claims in this tract of country, between the Rio Hondo and Sabine River, called the neutral territory.

The first section adds the country " situated between the Rio Hondo and the Sabine River, within the State of Louisiana, and, previously to the treaty of the 22d of February, 1819, between the United States and Spain, called the Neutral Territory," to the district south of Red River, requires the register and receiver to receive and record all written evidences of claims to land in that neutral country, " derived from, and issued by, the Spanish government of Texas, prior to the 20th of December, 1803, according to the regulations as to the granting of lands, the laws and ordinances of said government, and to receive and record all evidences of claim founded on occupation, habitation, and cultivation, designating particularly the time and manner in which each tract was occupied, inhabited, or cultivated, prior to, and on, the 22d day of February, 1819, and the continuance thereof subsequent to that time, with the extent of the improvement on each tract, and to receive and record such evidence as may be produced touching the performance of the conditions required to be performed by any holder of any grant, concession, warrant, or order of survey, or other written evidence of claim, and on which the validity of such claim may have depended under the government from which it emanated; and to receive and record all evidence of fraud in obtaining or issuing the written evidence of such claims, and of their abandonment or forfeiture."

Section second required the register and receiver to transmit to the Secretary of the Treasury a record of all the claims presented, and the evidence appertaining to each claim ; the claims to be arranged in four classes : —

1. A specification of complete titles, transfers, &c., where the conditions have been complied with.

2. All claims on written evidence not embraced in the first class, where the conditions on which the perfection into complete titles depended, according to the laws and ordinances of the Spanish government, are shown to have been complied with.

3. All claims founded on habitation, occupation, or cultivation, previously to the 22d of February, 1819, and in the manner which would have entitled the claimants to a title under the government exercising the sovereign power over that tract of country, and which in their opinion ought to be confirmed.

4. Those claims which, in the opinion of the register and receiver, ought not to be confirmed :

" Provided, that nothing contained in this act shall be considered as a pledge on the part of Congress to confirm any claim thus reported."

By a supplementary act, approved the 26th of May, 1824 (4 Stat. at Large, 65, ch. 182), the powers given, and duties required of, the register and receiver of the land-office south of Red River, in the State of Louisiana, by act of the 3d of March, 1823, ch. 30 (the act above recited), be extended to all that tract of country called the Neutral Territory, "lying east of the present western boundary of Louisiana, and west of the limits to which the land commissioners have heretofore examined claims to land in said State; and in the examination of claims to land within the aforesaid limits, the register and receiver shall in all respects be governed by the provisions of said act."

In November, 1824, these commissioners made a report, which was communicated to the Senate by the Secretary of the Treasury, on the 31st of January, 1825. (4 American State Papers, 69, claim 230.)

This report shows the powers, customs, and usages of the lieutenant-governors and commandants of the Spanish Province of Texas to grant lands as far back as 1792; then special instructions came, which were deposited among the public records ; they were not limited to any specific quantity, but it was their duty to apportion the quantity to the circumstances of the individuals asking concessions ; " to proportion their grants to the property, force, stock, and merit of the individual asking the grant."

" The. *procurador del comun* was the officer appointed to make inquiry, put the petitioner in possession, of the land prayed for, and execute the lieutenant-governor's and commandant's orders relative to the premises."

The lieutenant-governors and commandants of Nacogdoches were " not limited in the granting of lands to any specific quantity, but it was their duty to proportion the extent of the grants to the circumstances of the individual claiming them, and to that effect the *procurador del comun,* named to put the party in possession, inquired into the merits and circumstances of the applicant; and if the grant was for a stock farm, it was customary to extend the concession to two, three, and four leagues square, according to the wants and merits of the claimant."

" All grants signed and confirmed by the lieutenant-governor or commandant, executed in due form, were considered as vesting a complete title in the claimant, without any further process, and were recognized as such by the Governor of the Province, particularly by Governor Salcedo in 1810, when at Nacogdoches making his provincial visit."

" The limits of the late Neutral Territory, as considered by ancient authorities of Texas and Louisiana, comprehended all that country lying east of the Sabine, west of the branch of Red River called Old River, southwest of Arroyo Hondo, and south of Red River, to the northwestern boundary of the State of Louisiana."

" The inhabitants of the Neutral Territory were recognized as belonging to the jurisdiction of Nacogdoches; and the Spanish authorities considered their right of civil jurisdiction not taken away by the arrangement between General Wilkinson and Governor Herrera in the year 1806; yet it was seldom exercised or enforced."

" The public archives and records of the jurisdiction of Nacogdoches are not at that place at present; they were removed and carried off by John Jose Montero, in 1812, then commanding at Nacogdoches, when he abandoned that place," — " and were destroyed at San Antonio, where said Montero carried them."

Such is the substance of the testimony taken by the commissioners, and reported more at large in that volume, pp. 34, 35, and 36.

At page 69. claim 230, the commissioners report the claim of John Baptiste Lecompte, lying in the Neutral Territory, founded on the concession to D'Artigau, before set forth, containing, by the plat and survey by Joseph Irwin, a deputy surveyor of the United States in 1813, and filed with the claim,

two leagues square, or 23,507 acres; which concession " was signed by the commandant of Nacogdoches, dated 31st July, 1797, in favor of Jean Baptiste D'Artigau for the land claimed, transferred by said D'Artigau to Marie Louise Lecompte, Dame Porter, by act of exchange, dated ———, and by said Dame Porter transferred to the claimant by act of sale, dated the 19th of June, 1813; claimed also in virtue of habitation, occupation, and cultivation for more than thirty-three years."

The claim is further supported by the following testimony, taken before the board : —

" Gaspard Boudin : That the land has been constantly and uninterruptedly inhabited, occupied, and cultivated by those under whom the claimant, J. B. Lecompte, holds, by the claimant, and for his use by others, for more than thirty-three years preceding this date."   (That is, preceding this sitting of the commissioners.)

" We are of opinion this claim ought to be confirmed, and in the abstract have classed it with claims of second class." (Viz. incomplete grants, " where the conditions on which the perfection thereof into complete titles may have depended, according to the laws and ordinances of the Spanish government, are shown to have been complied with.")

In May, 1846, Lecompte filed his petition in the District Court of the United States (under the act of Congress of 1844 so often spoken of), setting forth the grant, the order of survey, possession under it, and a deduction of title from D'Artigau to the petitioner.   An answer was filed by Mr. Downe, District Attorney of the United States, denying generally all the facts and allegations of the petition.   Afterwards, by leave of the court, the following supplemental petition was filed : —

" The supplemental petition of Ambrose Lecompte, the plaintiff in the above-entitled suit, with respect represents, that the warrant and order of survey and grant legally made and issued to J. B. D'Artigau as aforesaid, in the original petition, was such as might and could have been perfected into a complete title under the laws, usages, and customs of Spain, had not the sovereignty of the country been changed; that the same was secured by treaty stipulations, and was and is good and valid under the law of nations, and by the several acts of Congress."

Much testimony was taken, which cannot very well be condensed, and in November, 1847, the cause came on for trial, when the court pronounced the following judgment: —

" The court having taken this cause under advisement, and having maturely considered the same, and it appearing that

the petitioner has not sustained, by the evidence offered, the validity of his claim against the United States to the land set forth in his petition, it is therefore ordered, adjudged, and decreed, that the suit be dismissed at the cost of the plaintiff.

"Judgment rendered 22d November, 1847.

"Judgment signed 15th December, 1847.

    (Signed,)               THEO. H. McCALEB, [SEAL.]

                                      *U. S. Judge.*"

Lecompte appealed to this court.

The case was argued by *Mr. Crittenden* (Attorney-General), for the United States. No counsel appeared for the appellant, but the record contained the following note of authorities filed by the counsel for the petitioner in the District Court.

*Note of Authorities, filed October 26th, 1847.*

"AMBROSE LECOMPTE *v.* THE UNITED STATES.

"The plaintiff in this case claims four leagues of land at a place called Lianacoco, in the late Neutral Territory, by virtue of a grant executed by Guadiana, commandant of the post of Nacogdoches, in favor of J. B. D'Artigau, who transferred the same to Marie Louise Lecompte, Dame Porter, from whom plaintiff acquired title.

"1st. The original title of the plaintiff is inchoate, but is such as under the court of Spain would have ripened into a perfect title, and should therefore be confirmed. Delassus *v.* United States, 9 Peters, 129, 134; Land Laws, ed. 1828, pp. 532, 548, 843.

"2d. The grant in question has by its terms a special location, to wit, so as to include the whole of the Prairie Lianacoco. 10 Peters, 340. Query, Was not this claim confirmed to the extent of one league by the act of Congress of the 12th of April, 1814 (Land Laws, ed. 1828, p. 651), and the act of the 29th of April, 1816 (p. 701)? 3 Howard, 788.

"3d. Inchoate titles were transferable. Chouteau's Heirs *v.* United States, 9 Peters, 144. Transfers of land could be made by parol under the Spanish law, and parol proof of such transfer is therefore admissible. Sanchez *v.* Gonzales, 11 Martin, 207; Gonzales *v.* Sanchez, 4 Ibid. N. S. 657; Le Blanc *v.* Viator, 6 Ibid. N. S. 257; Maes *v.* Gillard's Heirs, 7 Ibid. N. S. 317; Ducrest's Heirs *v.* Bijeau's Estate, 8 Ibid. N. S. 197; Sacket *v.* Hooper, 3 La. Rep. 107.

"See generally in this case 'extracts from the code of Spanish laws,' Appendix Land Laws, ed. 1828, p. 967; extract of the report of Valentine Ring & Co., Appendix Land Laws, 1039.

    (Signed,)                 P. A. MORSE, *Plaintiff's Attorney.*"

*Mr. Crittenden*, for the United States.

This claim originated in 1797, when Spain held undisputed domain and jurisdiction of the whole territory between the Rio Hondo and the Sabine River. The dispute about the domain and jurisdiction arose after the United States acquired Louisiana from France, under the act of retrocession of Louisiana by Spain to France. Spain denied that Louisiana included the territory between the Rio Hondo and the Sabine River. The controversy about this territory was adjusted by the treaty between the United States and Spain in 1819, which contained the provisions before mentioned in reference to private rights and interests derived from the lawful authorities of Spain before the 24th of January, 1818.

The following objections to this claim are apparent:—

I. It does not appear that D'Artigau ever handed his petition, with the indorsement thereon by Guadiana, to the *procurador del comun*, as required by the order of Guadiana, and by the laws, customs, and usages of Spain; and the *procurador del comun* never did inquire into "the property, force, stock, and merit" of D'Artigau, nor proportion nor apportion to him, nor put him in possession of, any part of the land petitioned for; which action by the *procurador del comun* was a condition precedent and indispensable to the validity of the claim.

II. There is no proof that D'Artigau ever had possession of a single arpent, or ever farmed, cultivated, or improved any part of the land petitioned for; or did, or caused to be done, any act whereby to acquire to himself in private right, as severed from the public domain, any definite quantity, or any specific tract, of land.

III. The Prairie Lianacoco (as represented on the plot exhibited as document No. 10) is in length about twelve hundred and forty perches, and in average width about two hundred and four perches, in area not exceeding sixteen hundred American acres; but the quantity claimed is to the amount of 23,705 American acres, equal to 27,777 superficial arpents of Spanish measure. Such being the area of the prairie, it was uncertain whether the *procurador del comun*, upon an examination as to "the property, force, stock, and merit" of D'Artigau, would have put him in possession of the whole of the prairie, and if not of the whole, of what part. And as to the quantity of two leagues square, including the prairie, the locality thereof was uncertain and vague, especially requiring the official act of the *procurador del comun* to give the claim a fixed locality, a precise certainty, so that the adjacent residuum might be known as subject to be granted to others.

The surveys which might be made of two leagues square

about and including this prairie are various and indefinite.
Of squares, each side measuring four hundred and eighty-five
chains (of four poles each), one might be made barely includ-
ing the east end of the prairie at the middle of that eastern
boundary, and extending due west; a second might be made
including the west end of the prairie, at the middle of that west-
ern boundary, and extending due east; a third might be made
including the points midway between the eastern and western
ends of the prairie, within and at the middle of the southern
boundary, and extending due north; a fourth might be made
including the point midway between the eastern and western
ends of the prairie, at and within the middle of the southern
boundary, and extending due south; a fifth, as represented on
plat exhibited, document 10, beginning at the point A, near the
western end of the prairie, thence south fifty degrees east, 204
four-pole chains; thence north forty degrees east, 484 chains;
thence north fifty degrees west, 485 chains; thence south forty
degrees west, 484 chains; thence south fifty degrees east, 281
chains, to the beginning; all and every one to include the
whole of the Prairie Lianacoco, yet including very different
lands outside of the prairie. Square figures, varying from the
cardinal points of the compass, and including the prairie nearer
or more remote from this angle or that, might be multiplied at
pleasure, each one answering as fully and as perfectly as any
other to the prayer of D'Artigau's petition, "so that in these
two leagues be included or embraced the entire prairie of Li-
anacoco."

This wandering uncertainty in the petition and order there-
on made to the *procurador del comun* would keep in suspense
more than one hundred thousand acres around the prairie, as
subject to be surveyed for D'Artigau, until the *procurador
del comun* had exercised his functions and performed his duty,
in giving a precise quantity and definite locality by a survey of
the land, and putting D'Artigau in possession according to the
metes and bounds of the survey.     This uncertainty illustrates
the propriety of Guadiana's order to the *procurador del comun,*
and the necessity that he should have performed his duty be-
fore D'Artigau could have had a valid right and interest in any
defined quantity, or in any fixed location of land.

IV.  The document No. 10, exhibited by complainant, which
he has called a survey made "by the proper authority under
the government of the United States," is not entitled to any
such appellation, nor to any legal effect or consequence.

The claimant at whose request Erwin made that survey and
plat is not stated; it does not profess to have been made by
virtue of any warrant, order of survey, or legal authority; it is

not an official paper; it was never returned by him to any office as an official act done by one lawfully deputed to do the act; it has never been acknowledged by the government of the United States, or by Spain, as an official act or authorized survey. Erwin had no authority from or under the government of the United States to make the survey; it does not appear whose deputy Erwin was; it does not appear by any evidence in the cause that Erwin was even in the employ of the United States as a deputy surveyor; certainly he was not authorized to make surveys upon Spanish concessions.

That document cannot be regarded in any other light than as a private, unofficial act, done by Erwin at the request of some private person, whose name he has not given, and for what purpose he has not stated.

V. There is no legal evidence to show that D'Artigau ever agreed to transfer, or did transfer, his claim to Marie Louise Lecompte, Madame Monet, Dame Porter; the proof relied on in that respect is totally defective as to time, place, circumstance, and competency. D'Artigau had not a transferable interest; there is no evidence to prove that Marie Louise Lecompte, Dame Porter, ever was accepted or acknowledged by the authorities of Spain as the assignee of D'Artigau; the *procurador del comun* never examined into her "property, force, stock, and merit," nor proportioned the quantity of land which she should have as assignee of D'Artigau, nor was she accepted in the place and stead of D'Artigau.

VI. How much land was improved, cultivated, fenced, and actually occupied by Marie Louise Lecompte, Dame Porter, or by those claiming under her, does not appear; and mere possession cannot be allowed to give right and title against the government of Spain or of the United States.

Recopilacion (White's), p. 83, "Of the Capacity of the Thing," and pp. 85, 86, "Of Time Immemorial as necessary to prescribe."

VII. This claim is not valid by the laws of Spain, is not protected by the treaty of 1819, nor by the law of nations. The condition annexed by the laws of Spain to the order and concession of Guadiana was never fulfilled. This is an attempt by Marie Louise Lecompte and the complainant to set up the derelict abandoned claim of D'Artigau, who died in 1799 or 1800, without having presented the order of Guadiana to the *procurador del comun*, without having acquired any valid right or title to an acre of the land alluded to in his petition.

VIII. This claim is invalid according to the principle settled by this court in the cases of U. States v. King, 3 Howard, 786, 787; U. States v. Forbes, 15 Peters, 183, 184; Buyck v. U.

States, 15 Peters, 225; O'Hara *v.* U. States, 15 Peters, 281, 283; U. States *v.* Delespine, 15 Peters, 334, 335; U. States *v.* Miranda, 16 Peters, 160, 161.

This court cannot know what quantity of land the *procurador del comun* would or ought to have assigned to D'Artigau if he had presented Guadiana's order, nor the local identity which he would have given. The courts of the United States cannot relieve against such a palpable neglect of the claimant, such a primitive uncertainty as to the quantity of land, and such a radical defect of specialty.

Mr. Justice DANIEL delivered the opinion of the court.

This is an appeal from a decree of the District Court of the United States for the District of Louisiana, pronounced on the 22d of November, 1847, dismissing the petition of the appellant, filed under authority of the act of Congress of June 17th, 1844, and by which was claimed of the United States a tract of land situated in Louisiana of four square superficial leagues, or about 23,705 American acres.

The appellant, as the heir of Marie Louise Lecompte (also styled Dame Porter and Madame Monet), and as heir of his late father, Jean Baptiste Lecompte, bases his claim upon the following statements. He asserts that on the 31st of July, 1797, one Jean Baptiste D'Artigau, then an inhabitant of Nacogdoches, presented his petition to José Maria Guadiana, then lieutenant-governor and military commandant of the post of Nacogdoches, asking for a grant of two leagues square, to include the whole of the Prairie Lianacoco, which prairie should (as the petition to the District Court represents) be the centre of the said grant; that on the same day Guadiana did grant and issue his order of survey to the proper officer to put the petitioner D'Artigau in possession, without prejudice to third persons; and that D'Artigau took immediate possession of the above-described lands, and continued to possess, inhabit, and cultivate the same, until he transferred them by an act of exchange to Marie Louise Lecompte. The petitioner next states, that Marie Louise Lecompte transferred the above-described tract of land to Jean Baptiste Lecompte, the father of the petitioner; that there is no one residing upon the land in question except one person, who holds under the petitioner; that no person other than the petitioner claims any part of the land; and that the United States have never to his knowledge sold any part thereof. Such are substantially the averments on which the plaintiff has placed his claim, and we will proceed to examine how far, either intrinsically, or as sustained by any evidence adduced in their support, they entitled the plaintiff to the establishment of that claim.

In considering this petition of the appellant, the circumstance which first strikes the attention is the extreme vagueness of its statements, and indeed its entire omission of facts which on the slightest view would appear indispensable to give validity to this claim. Thus, after setting forth the concession, and an order to the proper officer to cause a survey in order to put the petitioner in possession according to survey, and with due regard to the rights of others, omitting any and every fact or circumstance tending to show a compliance with these directions, and the security they were designed to extend either to the government or to individuals, it is said that D'Artigau took possession, and held the land until he transferred it to another. This vagueness and this omission in the statements in the petition are by no means immaterial, inasmuch as, if permitted, they would in effect dispense with all compliance with the express orders of the granting power, and the terms it had annexed to its bounty; would dispense also with what has ever been deemed indispensable, — some act or recognition showing the separation of the subject granted from the royal domain. And in truth the statement in the petition of the appellant is not consistent with, but in terms as well as in effect conflicts with the order of Guadiana, the Spanish commandant, as filed in support of the appellant's claim. The language of the Spanish commandant is as follows: " Let this petition be handed to the solicitor-general of this place, in order that the petitioner be placed in possession of the land therein mentioned, if in so doing no prejudice can result to third persons." Can this language be correctly construed to signify an absolute, unconditional grant of any specific land or other thing, — such a grant as put an end to, or denied, the superior revising authority and duty of the government to take care both of the rights of the crown and of individuals? So far from it, the authority of the government in relation to both are here expressly reserved. There is nowhere in this record to be found a scintilla of proof, that this order, or the petition on which it was founded, was ever presented to the solicitor-general, or that any act was performed by any functionary of the government severing the land from the public domain, or putting the petitioner D'Artigau, or any other person, in possession of any specific land, so that a boundary or limit could be defined by possession. There is in fact no proof that D'Artigau took possession of any thing certain or specific, or had a right to possess himself of any thing specific.

Again, there seems to be an attempt, by the statement in the petition to the District Court, to give a definiteness to the claim or the right by possession, which the language or

11 *

the concession by no means warrants. Thus it is said in the petition, that the application of D'Artigau prayed for a grant of which the Prairie Lianacoco should be the centre. There is no such language in the application presented to the Spanish commandant. That application asked for a grant which might include the prairie above named, but in what part of the grant, whether in relation to the centre or to any of its exterior boundaries, neither in the prayer to the Spanish authorities, nor in the order which followed, can any reference whatsoever be found.

The importance of the omission to aver and to prove a delivery of the order of Guadiana, the Spanish commandant, to the *procurador del comun*, or solicitor-general, and the action of the latter upon that order, is shown in another point of view. In the report of the commissioners for the settlement of land claims in Louisiana, dated November, 1824 (4 American State Papers, 34, 35, and 69), the following regulations are given as those prescribed for the Spanish officers, and practised upon by them in making grants for lands in the district of Nacogdoches: "The lieutenant-governors and commandants of Nacogdoches were not limited, in the granting of lands, to any specific quantity, but it was their duty to proportion the extent of the grants to the circumstances of the individual claiming them, and to that effect the *procurador del comun* named to put the party in possession inquired into the merits and circumstances of the applicant; and if the grant was for a stock farm, it was customary to extend the concession to two, three, and four leagues square, according to the wants and merits of the claimants. The *procurador del comun* was the officer appointed to make inquiry, put the petitioner in possession of the land prayed for, and execute the lieutenant-governor's and commandant's orders relative to the premises." Such, we are told, were the functions and duties of the *procurador* or solicitor-general relative to grants of land in this district. It was he who was to supervise the severance of the object to be granted from the royal domain, to give it form and extent, either by designating ascertained and notorious limits and boundaries, or by directing an actual survey, and by reporting the proceedings he may have directed, for the sanction of his superior. The applicability of the functions and duties of this officer to the case before us is evinced by reference to the character of this application to the government. This was not a prayer for an ordinary portion of land for cultivation, but an application for a wide extent of territory; such an extent as would be proper or requisite only upon the supposition of its necessity for the occupation of a large stock and a numerous

force. The petitioner avows his intention of raising horses, mares, and horned cattle, a purpose requiring an extensive range, if carried into effect in good faith. . It became, therefore, peculiarly proper to inquire into the means of the applicant, and into the probabilities of his executing his proffered inten-, tions; as it would be highly detrimental to the Province to permit an individual to retain a large and useless extent of unsettled land, and unjust to other settlers to permit such individual, under a false suggestion, to acquire an extensive property for the mere purposes of speculation. Hence it was, no doubt, that the order of the commandant of even date with the petition was issued, sending the petition to the officer who was to judge of its propriety, and without whose direction there could be neither a severance of the land from the royal domain, nor regular legitimate possession in any one.

These conclusions are in strict accordance with the numerous decisions in this court, which insist on the necessity for the severance of the property claimed from the public domain, either by actual survey or by some ascertained limits or mode of separation recognized by a competent authority. The decisions just referred to, it would be tedious to cite in detail in this place; their effect, however, may be seen in the following perspicuous summary, made by the Chief Justice in the case of the United States *v.* King et al., in 3 Howard, 786, 787, in which he says, speaking of the documentary evidence in that case : " The instruments themselves contain no lines or boundaries whereby any definite and specific parcel of land was severed from the public domain; and it has been settled by repeated decisions in this court, and in cases, too, where the instrument contained clear words of grant, that if the description was vague and indefinite, as in the case before us, and there was no official survey to give a certain location, it could create no right of private property in any particular parcel of land, which could be maintained in a court of justice. It was so held in the cases in 15 Peters, 184, 215, 275, 319, and in 16 Peters, 159, 160. After such repeated decisions upon the subject, all affirming the same doctrine, the question cannot be considered as an open one in this court. The land claimed was not severed from the public domain by the Spanish authorities, and set apart as private property, and consequently it passed to the United States by the treaty which ceded to them all the public and unappropriated lands."

They accord likewise with the decisions of the Supreme Court of Louisiana as reported in 8 Martin, 637, and in 5 Martin's New Series, 110, in the former of which cases the court say : " There is no order of survey; no decree of any kind is given

by the intendant or his representative. The application stands unanswered. Now supposing the parties to be in the situation in which they were before the relinquishment of the rights of the United States, would the plaintiff be able to eject the possessor of the land with such a paper, — a paper which is the act of the party alone, and bears not the slightest intimation of the grantor's pleasure?" And in the latter case the court held, "that a permission to settle, obtained on a *requête*, but not followed by an actual settlement, did not give a right superior to that resulting from an actual settlement without permission, or, in other words, from a naked possession." And in the case of Blanc *v.* Lafayette, decided during the present term, the person from whom the appellant deduced his title had upon a petition to the Spanish intendant obtained an order 'to the surveyor-general to lay off the land. No report was alleged or proved to have been returned by the surveyor-general upon the petition; and although this claim was favorably reported upon by the commissioners, and although it was insisted upon as having been confirmed by act of Congress of 1814, confirming a particular class of incomplete French and Spanish grants, concessions, warrants of survey, having a special and definite location, yet as this order to survey had not been executed, and as the claim was not sustained by certain and definite boundaries, nor by proof of certain and full possession, the Supreme Court of Louisiana decided, notwithstanding a recommendation by the commissioners and the act of Congress of 1814, that, there being no survey and no definite location or description by possession, such as could create a specific right or title under the Spanish authorities, the recommendation of the commissioners and the act of Congress did not cure these radical defects, nor confirm a title so wholly undefined, and deduced from so defective an origin. The opinion of the court of Louisiana has met the approbation of this court, who have again ratified the principles of that decision in the case of the United States *v.* Boisdoré's Heirs, during the present term.

In the absence of documentary evidence showing any act of the Spanish authorities beyond the first order of the commandant, sundry witnesses have been examined, with the view to supply this deficiency, and to give certainty and definiteness to the claim by proof of occupation. A proper analysis of the statements by the witnesses must exhibit them as coming signally short of the ends for which they have been introduced.

The witnesses Grenaux and Plaisance knew nothing whatever of a grant to D'Artigau, nor of any exchange of property between D'Artigau and Madame Lecompte.

Gaspard La Cour knew D'Artigau. Always understood

that Madame Lecompte obtained the land in exchange with D'Artigau, — but does not know for what it was exchanged; never saw any instrument or other document showing a grant of survey to D'Artigau, or any exchange between the latter and Madame Lecompte; — witness is unable to write.

The evidence most favorable to this claim is that of Prud'-homme; but this testimony should be taken subject to the admission of the witness that he is a connection of the claimant. Prud'homme states that he knew D'Artigau more than fifty years ago, — knew that D'Artigau had a large concession (how large he does not state), including the Prairie Liana-coco; knows that D'Artigau transferred this concession to Marie Louise Lecompte in exchange for another tract of land at the Tancock Prairie; is sure that this exchange took place before the establishment of the United States government in Louisiana (the witness gives no date for this transaction). Witness knows that, more than fifty years ago, the plaintiff and those under whom he claimed had possession of the Prairie Lianacoco, as a *vacherie*, and has kept the same up to this time.

Recurring now to this testimony, so far as it is adduced to establish a title by showing specific limits by occupation on the part of D'Artigau, not one of the witnesses proves actual occupation by D'Artigau of any thing.  La Cours understood that Madame Lecompte obtained the land (what land is not shown) in exchange with D'Artigau, and even Prud'homme can say no more than that D'Artigau had a large concession including the Prairie Lianacoco, and exchanged it with Madame Lecompte for the Tancock Prairie.  Limits, specific quantity, certain descriptions, such as might constitute severance from the royal domain, are then wholly out of the question, so far as these or any of these requisites can be deduced from possession by D'Artigau; — for he never had possession, and could therefore transfer no right resulting from possession to Madame Lecompte, or to any other person.  We have already considered how far such a severance could be deduced from the order of the commandant at Nacogdoches.

In the next place, with regard to the possession of Madame Lecompte, or of those claiming under her, relied on as the foundation of title, it will be seen that this evidence is utterly inadequate to any of the purposes for which it is adduced. The utmost that any witness has been able to state on this point is a possession of the Prairie Lianacoco, forming, as is admitted on all sides, but a small portion of the claim insisted upon, and hence not forming a description, either as to quantity, locality, or limits, to direct in ascertaining that claim.  And

even with respect to this prairie itself, there is nothing to show its position, extent, or limits, or the actual occupation of the whole or of any specific part of it by the ancestor of the appellant. Upon this subject the record is singularly barren. The only fact we can gather from it, as indicating the extent of the occupation, is one which seems strongly to militate against a right coextensive even with this fragment of the entire claim. The fact here alluded to is the averment in the petition, that there is a single individual residing upon some portion of the land, who holds under the petitioner; but on what portion, or by what metes and bounds, whether within or without the limits of the Prairie Lianacoco, is left wholly to conjecture.

Upon the whole, therefore, we are of the opinion, that neither upon the isolated order issued on the 31st of July, 1797, by the commandant at Nacogdoches, nor by virtue of any fact or testimony adduced for the purpose of showing a right to the land claimed as resulting from occupation, settlement, or cultivation, or from any act of the commissioners, or any law of the United States founded thereupon, has the claim of the appellant been sustained. We therefore adjudge that the decree of the District Court of the United States for the District of Louisiana, dismissing the petition of the appellant, be, and the same is hereby, affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said District Court in this cause, dismissing the petition of the claimant, be, and the same is hereby, affirmed.