DAIGLE v. UNITED STATES et al.

(Circuit Court of Appeals, First Circuit. November 8, 1916.)

No. 1191.

1. CUSTOMS DUTIES ⊚⟼130—IMPORTATION OF PROHIBITED GOODS—FORFEITURE.
   Potatoes, the importation of which is prohibited, cannot, on being brought into the United States, be forfeited under Rev. St. §§ 2865, 3082 (Comp. St. 1913, §§ 5548, 5785), or under sections 3082 and 3097 (Comp. St. 1913, §§ 5785, 5809), as they are not dutiable.
   [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 296–315; Dec. Dig. ⊚⟼130.]

2. AGRICULTURE ⊚⟼9½, New, vol. 4 Key-No. Series—UNLAWFUL IMPORTATION—QUARANTINE REGULATIONS—FORFEITURE.
   Under Quarantine Act Aug. 20, 1912, c. 308, § 7, 37 Stat. 317 (Comp. St. 1913, § 8758), authorizing the Secretary of Agriculture to forbid the importation into the United States of any fruits, vegetables, etc., necessary to prevent the introduction into the United Staes of any disease, or of any injurious insect not theretofore widely prevalent throughout the United States, the Secretary of Agriculture, on December 22, 1913, forbade the importation, from the Dominion of Canada, Newfoundland, and other countries, of the common potato, because afflicted with potato diseases

⊚⟼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not widely distributed throughout the United States. Plaintiff in error introduced from Canada into the United States potatoes in violation of such order, and without submitting them for inspection by customs officials. Rev. St. §§ 3061, 3062 (Comp. St. 1913, §§ 5763, 5764), respectively declare that any officers authorized to board or search vessels may examine any vehicle or person, on which or whom he shall suspect there is merchandise subject to duty, or introduced into the United States contrary to law, and that every such vehicle, together with motive power used in drawing or propelling the same, shall be subject to seizure and forfeiture. Section 3082 (section 5785) provides for the forfeiture of merchandise fraudulently imported into the United States contrary to law, while section 3100 (section 5812) declares that all merchandise and other articles imported into the United States from any contiguous foreign country, as well as vehicles, shall be inspected at the first port of entry where they shall arrive. *Held* that, as goods which are properly subjects of import, whether dutiable or nondutiable, are imported contrary to law, unless inspected by an inspector, on being imported from Canada, the potatoes, though not dutiable, and though not a lawful subject of importation, because their introduction into the country was forbidden, were imported contrary to law, unless inspected, and the potatoes, as well as the vehicles and animals used in transporting them, are subject to forfeiture.

3. CUSTOMS DUTIES ⟜130—FORFEITURES—LIBEL OR INFORMATION.
     The claimant of potatoes imported into the United States in violation of law, as well as the vehicles used in their importation, all of which were sought to be forfeited, cannot, though the importation was by land, complain that the process was termed a libel of information, rather than a libel, though a libel of information is the proper process to procure a forfeiture in case of a seizure upon the sea; the instrument alleging that the seizure was by land.
     [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 296–315; Dec. Dig. ⟜130.]

4. EVIDENCE ⟜39—JUDICIAL NOTICE.
     The court may take judicial notice of treaties between the United States and Great Britain relating to the boundary line between the United States and Canada, as well as public acts and proclamations carrying the treaties into effect, for they are historical and nortorious facts, and hence the admission of a map filed by the commissioners appointed under the Webster-Ashburton treaty of 1842 to locate the boundary cannot be objected to, because their report was not introduced; it being presumed that the court took judicial notice of the report.
     [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 53; Dec. Dig. ⟜39.]

5. APPEAL AND ERROR ⟜1047(1)—REVIEW—HARMLESS ERROR.
     Where the Webster-Ashburton treaty of 1842, fixing the boundary line between the United States and Canada, and the map and the report of commissioners appointed to locate the boundary line were conclusive proof of the location, a ruling by the court that the map of the commissioners, the report and treaty not having been introduced, conclusively fixed the boundary, was harmless error, for the court could and undoubtedly did take notice of the treaty and report.
     [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4146, 4150–4152; Dec. Dig. ⟜1047(1).]

6. APPEAL AND ERROR ⟜1056(2)—REVIEW—HARMLESS ERROR.
     In a proceeding to forfeit potatoes, together with the vehicles used in bringing them into the United States, on the ground that they were unlawfully imported from an island in the St. John river, which was part of the Dominion of Canada, claimant, who imported the potatoes, having been notified by customs inspector that produce from the island could not be

brought into the United States unless duties were paid, cannot complain of the exclusion of evidence that there were monuments on the island from which he deemed that it was part of the territory of the United States, and that therefore he imported the potatoes in good faith.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4188; Dec. Dig. �köm1056(2).]

In Error to the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Libel of information by the United States of America and others against Twenty-Two Barrels of Potatoes and other property claimed by Hilaire Daigle. There was a judgment of forfeiture, and claimant brings error. Affirmed.

Herbert E. Locke, of Augusta, Me. (W. R. Pattangall, of Augusta, Me., on the brief), for plaintiff in error.

John F. A. Merrill, U. S. Atty., of Portland, Me., for defendants in error.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

BINGHAM, Circuit Judge. This is a libel of information, brought by the United States attorney for the district of Maine against twenty-two barrels of potatoes, two horses, a pair of double harnesses, and a wagon, described in the libel, and under seizure by the collector of customs of that district as being forfeited to the United States. The causes of forfeiture set out in the libel are hereafter stated and considered.

Daigle appeared as claimant of the property, filed a special demurrer, and made answer, denying all the allegations of the libel.

The potatoes were raised by the claimant on Daigle Island, which is situated in the St. John river, some 400 or 500 feet from his farm, at Ft. Kent, in the state of Maine, and were brought from the island to Ft. Kent on October 14, 1914. Immediately after they were brought in there they were seized by the customs officers, together with the other property mentioned in the libel. The jury found that the property seized by the officers was unlawfully imported into the United States, as charged in the information.

In the court below the government contended that Daigle Island was British soil, while the claimant's contention was that it was a part of his farm in Ft. Kent. The District Court ruled that Daigle Island was Canadian territory, belonging to Great Britain. The claimant requested the court to rule, as a matter of law, that neither the potatoes nor the other property enumerated in the libel were subject to forfeiture on any of the four grounds stated in the libel, for the reason that the potatoes were not, on October 15, 1914, subject to duties under the customs laws of the United States then in force, and that the customs officers had no duties to perform with reference to their importation, because, under the act of Congress known as the "Plant Quarantine Act" (37 Stat. at Large, p. 315), and by virtue of an order of the Secretary of Agriculture of the United States, under date of December 22, 1913, made in pursuance of the authority conferred upon him by said

237 F.—11

act, the importation of the potatoes from Canada was absolutely forbidden by law. The court ruled that the embargo was not a defense to the libel. The claimant excepted, and assigned this ruling as error.

[1, 2] The question presented is whether the 22 barrels of potatoes, together with the other property enumerated in the libel, which was used in bringing the potatoes into this country from Canada, were subject to seizure and condemnation on any of the grounds stated in the four counts of the libel, in view of the fact that the importation of the potatoes into the United States was prohibited under the Plant Quarantine Act and the order of the Secretary of Agriculture in pursuance thereof.

The Quarantine Act provides:

"Sec. 7. That whenever, in order to prevent the introduction into the United States of any tree, plant, or fruit disease or of any injurious insect, new to or not theretofore widely prevalent or distributed within and throughout the United States, the Secretary of Agriculture shall determine that it is necessary to forbid the importation into the United States of any class of nursery stock or of any other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products from a country or locality where such disease or insect infestation exists, he shall promulgate such determination, specifying the country and locality and the class of nursery stock or other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products which, in his opinion, should be excluded. Following the promulgation of such determination by the Secretary of Agriculture, and until the withdrawal of the said promulgation by him, the importation of the class of nursery stock or of other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products specified in the said promulgation from the country and locality therein named, regardless of the use for which the same is intended, is hereby prohibited; and until the withdrawal of the said promulgation by the Secretary of Agriculture, and notwithstanding that such class of nursery stock, or other class of plants, fruits, vegetables, roots, bulbs, seeds or other plant products be accompanied by a certificate of inspection from the country of importation, *no person shall import or offer for entry into the United States from any country or locality specified in such promulgation, any of the class of nursery stock or of other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products named therein, regardless of the use for which the same is intended:* Provided, that before the Secretary of Agriculture shall promulgate his determination that it is necessary to forbid the importation into the United States of the articles named in this section he shall, after due notice to interested parties, give a public hearing, under such rules and regulations as he shall prescribe, at which hearing any interested party may appear and be heard, either in person or by attorney: Provided further, that the quarantine provisions of this section, as applying to * * * white-pine blister rust, potato wart, and the Mediterranean fruit fly, shall become and be effective upon the passage of this act."

"Sec. 10. That any person who shall violate any of the provisions of this act * * * shall be deemed guilty of a misdemeanor and shall, upon conviction thereof, be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both such fine and imprisonment, in the discretion of the court," etc.

December 22, 1913, David F. Houston, Secretary of Agriculture, issued a notice of a potato quarantine under his hand and the seal of the United States, Department of Agriculture, reading as follows:

"The fact has been determined by the Secretary of Agriculture that injurious potato diseases, including the powdery scab (Spongospora subterranea), new to and not heretofore widely prevalent or distributed within and throughout the United States, existing in the Dominion of Canada, Newfoundland, the

islands of St. Pierre and Miquelon, Great Britain, Ireland, and Continental Europe, and are coming to the United States with imported potatoes.

"Now, therefore, I, David F. Houston, Secretary of Agriculture, under the authority conferred by section 7 of the act of Congress, approved August 20, 1912, known as 'the Plant Quarantine Act' (37 United States Statutes at Large, page 315), do hereby declare that it is necessary, in order to prevent the introduction into the United States of such potato diseases, to forbid the importation into the United States, from the countries hereinbefore named, of the common or Irish potato (Solanum tuberosum) until such time as it shall have been ascertained, to the satisfaction of the Secretary of Agriculture, that the country or locality from which potatoes are offered for import is free from such potato diseases.

"On and after December 24, 1913, and until further notice, by virtue of said section 7 of the act of Congress, approved August 20, 1912, the importation, from the countries hereinbefore named, of the common or Irish potato, except for experimental or scientific purposes by the Department of Agriculture, is prohibited: Provided, that shipments of such potatoes loaded prior to December 24, 1913, as shown by consular invoices, will be permitted entry up to and including January 15, 1914."

Rev. St. § 3082 (Comp. St. 1913, § 5785), provides:

"If any person shall fraudulently or knowingly import or bring into the United States, or assist in so doing, any merchandise, contrary to law * * * such merchandise shall be forfeited," etc.

If it had been alleged in the libel that the goods in question had been knowingly brought into the United States contrary to law, in that their importion was prohibited under the Plant Quarantine Act and the order of the Secretary of Agriculture, there would be little doubt but that the potatoes, together with the other property used in bringing them into the country, would be subject to seizure and condemnation under Rev. St. §§ 3082, 3061, 3062 (Comp. St. 1913, §§ 5785, 5763, 5764), and section 7 of the Quarantine Act; but none of the counts of the libel contain such allegations.

The forfeiture cannot be sustained under the first two counts of the libel for these counts are evidently based upon sections 3082 and 2865 of the Revised Statutes (Comp. St. 1913, §§ 5785, 5548). In both of these counts it is alleged that the importation was contrary to law in that the potatoes were subject to the payment of duties, were smuggled and clandestinely introduced into the United States with intent to defraud the government of its revenue, and without payment of the duties—facts which were not and could not be proved, for the potatoes were not dutiable, their importation being prohibited.

In the third count it is alleged that the potatoes were knowingly imported into the United States contrary to law in that they were brought in without offering the same for entry to a customs official of the United States, and it is sought to support this count under sections 3082 and 3097 of the Revised Statutes (Comp. St. 1913, §§ 5785, 5809). But it will be seen that under the provisions of section 3097 the merchandise of which entry must be made is "merchandise subject to duties," and, as the potatoes here in question, as above pointed out, are not merchandise subject to duty, the failure to make entry of them was not a violation of the provisions of that section.

In the fourth count it is alleged that the potatoes were knowingly imported into the United States from Canada contrary to law in that

they "had not been unladen in the presence of or inspected by an inspector or other officer of the customs of the said United States at the first port of entry or customs house where the merchandise had arrived," and it is sought to sustain the seizure and condemnation of all the property mentioned in this count of the libel under the provisions of sections 3082, 3100, 3061, and 3062. The last three sections read as follows:

"Sec. 3100. All merchandise, and all baggage and effects of passengers, and all other articles imported into the United States from any contiguous foreign country, except as hereafter provided, as well as the vessels, cars, and other vehicles and envelopes in which the same shall be imported, shall be unladen in the presence of, and be inspected by, an inspector or other officer of * * * customs, at the first port of entry or custom house in the United States where. the same shall arrive," etc.

"Sec. 3061. Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person,. on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial.

"Sec. 3062. Every such vehicle and beast, or either, together with teams or other motive-power used in conveying, drawing, or propelling such vehicle or merchandise, and all other appurtenances, including trunks, envelopes, covers, and all means of concealment, and all the equipage, trappings, and other appurtenances of such beast, team, or vehicle, shall be subject to seizure and forfeiture. * * *"

It is evident from the provisions of section 3100 (Comp. St. 1913, § 5812) that goods which are properly subjects of import, whether dutiable or non-dutiable, unless they are unladen in the presence of or inspected by an inspector or other officer of the United States on being imported from Canada, are imported contrary to law, and that in the present case the potatoes, if they were subjects of import, though non-dutiable, having been brought in without being submitted for inspection, would be subject to seizure and condemnation under sections 3082, 3061, and 3100, and the horses, harnesses and wagon, used in bringing them in would be subject to seizure and condemnation under sections 3082, 3061, and 3062. But the contention is made that the potatoes here in question were not subjects of import, even as non-dutiable articles, for their importation was prohibited under the Plant Quarantine Act and the order of the Secretary of Agriculture, and the question is whether the provisions of section 3100 apply to merchandise, the importation of which is prohibited, and require that it, on being brought "into the United States from any contiguous foreign country, * * * shall be unladen in the presence of, and be inspected by, an inspector or other officer of * * * customs, at the first port of entry or custom house in the United States where the same

shall arrive." Although merchandise, the importation of which is expressly prohibited, cannot lawfully be imported, it does not follow that its introduction into the country will not also be contrary to the provisions of section 3100, if not submitted for inspection, so that it may be excluded. The provisions of section 3100 are broad in their terms. They contemplate that "all merchandise, and all baggage and effects of passengers, and all other articles imported into the United States from any contiguous foreign country" shall be subjected to inspection at the first port of entry or custom house in the United States where the same shall arrive, with the single exception provided for in section 3102 (Comp. St. 1913, § 5814), which has nothing to do with this case.

We are therefore of the opinion that all merchandise introduced into this country from Canada, whether subject to duty, free from duty, or the importation of which is prohibited, is introduced in violation of law, if not submitted for inspection as required by section 3100, and that the District Court was right in ruling that the Plant Quarantine Act and the order of the Secretary of Agriculture did not constitute a defense to the libel as applied to the fourth count.

[3] The contention is made that the court erred in overruling the demurrer on the ground that a libel of information is not the proper process to procure a forfeiture in case of a seizure on land; that the process should be styled an information, and not a libel of information, which is the process provided for the forfeiture of property seized upon the sea. It is not claimed, however, that in this proceeding it was not alleged that the seizure was on land or that this allegation was not sufficient to give the court jurisdiction, as a court of common law. This being so, we think it matters little that the process was termed a libel of information rather than an information, and that the contention is without merit.

[4, 5] The jurisdictional boundary between Canada and the United States on the St. John river in the locality of the claimant's farm was in issue. This boundary line was established under the Webster-Ashburton treaty of 1842, article I of which provides as follows:

"Beginning at the monument at the source of the river St. Croix as designated and agreed to by the commissioners under the fifth article of the treaty of 1793, between the governments of the United States and Great Britain; thence, north, following the exploring line run and marked by the surveyors of the two governments in the years 1817 and 1818, under the fifth article of the treaty of Ghent, to its intersection with the river St. John, and to the middle of the channel thereof; *thence, up the middle of the main channel of the said river St. John, to the mouth of the river St. Francis,*" etc.

In article VI of the treaty it was provided that two commissioners should be appointed, "one by the President of the United States, by and with the advice and consent of the Senate thereof, and one by Her Britannic Majesty," and that they should "proceed to mark the line above described, from the source of the St. Croix to the river St. John, and shall trace on proper maps the dividing line along said river and along the river St. Francis to the outlet of the Lake Pohenagamook," etc. The treaty also required the commissioners to make a joint report to their respective governments describing such line or bound-

ary, and to accompany the same with maps certified by them to be true maps of the new boundary. By the treaty of July 1, 1908, between Great Britain and the United States relating to the same boundary, it was agreed in article III that the boundary as described and laid down in articles I and VI of the treaty of 1842 should be re-marked and charted. In this treaty it is recited that:

"The commissioners appointed under article VI of the treaty of 1842 aforesaid were required to and did mark by monuments the land portion only of said line, and were not required to and did not mark by monuments the portions of the boundary extending along water courses, with the exception that the nationality of the several islands in the St. John river was indicated by monuments erected thereon, and a series of monuments were placed by them along the edge of certain of the water courses to fix the general direction of the boundary, most of which monuments have since disappeared, but the entire boundary, including its course through the waterways as well as on land, was charted and marked on maps by said commissioners under the provisions of article VI, above referred to, and the nationality of the respective islands in the St. John river was determined by them, as appears from the joint report filed by said commissioners dated June 28, 1847, and the series of maps signed by said commissioners and filed with their joint report."

At the trial in the District Court no evidence with reference to the boundary and its location was submitted to the jury. As an aid in determining this question, counsel for the government presented to the court a map, purporting to be a copy of the map filed by the commissioners appointed under the Webster-Ashburton treaty of 1842, which was certified to under the seal of the Department of State, and the provisions of the treaty were called to the attention of the court. The report of the commissioners under the treaty of 1842, which they were directed to make and file with the map, was not presented to the court, and, because of this, the claimant objected to the map as an incomplete document.

In determining the location of the international boundary at the place in question, it was the right of the court to take into consideration the treaties above spoken of, together with the public acts and proclamations in carrying them into effect, as they were historical and notorious facts of which it could take judicial notice. United States v. Reynes, 9 How. 147, 13 L. Ed. 74; Callsen v. Hope (D. C.) 75 Fed. 758. And as the court was authorized to take judicial notice of these documents, it is to be presumed that he took cognizance of the report, as well as the treaty and map. This being so, the formal presentation of the report to the court was unnecessary.

The court ruled that the map was absolute proof of the location of the boundary line and that Daigle Island was Canadian territory. This ruling, so far as it related to the map being absolute proof, was perhaps technically incorrect; but it is difficult to see wherein the claimant was harmed by the ruling, as the treaty taken in connection with the report and the map of the commissioners, of which the court took judicial notice, was undoubtedly conclusive proof of the location of the boundary at the point in question. The treaty fixed the boundary on the St. John river at the middle of the main channel of the stream, and the map made in pursuance of the treaty shows Daigle Island to be on the Canadian side of the main channel.

[6] The claimant also insists that the District Court erred in excluding certain evidence whereby he proposed to show that at a time subsequent to the Webster-Ashburton treaty there were monuments on Daigle Island marking the boundary line. It is claimed that the purpose of this offer was (1) to show where the boundary line was in fact laid on the ground, and (2) the claimant's understanding of where the line was as bearing on the good faith of his act in bringing in the potatoes.

What the monuments on Daigle Island marking the boundary were, the offer does not disclose. The Webster-Ashburton treaty did not authorize the commissioners to place monuments along the course of the St. John river. As to this portion of the boundary, they were simply directed to indicate on their map the location of the main channel of the stream. This they did, and it is wholly improbable that they placed any monuments upon this island to indicate the boundary line. The treaty of 1908 shows that the monuments placed upon the islands in the river were not to indicate the boundary line, but whether a particular island was American or British territory, according as it was on one side or the other of the main channel of the stream. And this is also clearly shown by the marks on the map made by the commissioners which, as before stated, shows Diagle Island as Canadian territory. This offer of proof, therefore, could have been of no consequence as showing where the boundary line was on the St. John river, if it was competent. The main channel of the river was fixed by the treaty as the bound. It was in existence at the time the treaty was made, and required no action on the part of the commissioners for its establishment. Their only duty with respect to it was to indicate it on the map.

We are therefore of the opinion that the treaty, map, and commissioners' report constituted the only competent evidence on the question, and that the claimant could have been in no way injured by the exclusion of the testimony as bearing on the true location of the line.

If the offer was also for the purpose of showing that claimant did not knowingly bring the potatoes from Daigle Island to Ft. Kent contrary to law, as he understood the boundary line was where the monuments were placed on the island, the claimant was not injured by the exclusion of his offer for it appeared that he was specifically notified by the collector of customs, through his deputy, about a month prior to bringing the potatoes to Ft. Kent, that Daigle Island was Canadian territory, and that no produce of the island was to be brought in unless duties were paid.

The decree of the District Court is affirmed.